## No. 12,297.

### W. R. NELSON VS. CRESCENT CITY RAILROAD CO.

Under our jurisprudence it is not essential in a suit against a corporation for damages caused by its agent, to aver that the corporation had the power to prevent the act of the agent and failed to do so. Civil Code, Art. 2315, 2320, Hart vs. Railroad Co., 1 Rob. 181; 27 An. 716; 37 An. 654.

If, with due attention the motorman of a street car could and should have perceived a child of tender age, on or straying near the track, under circumstances indicating the great danger of the child, the motorman should seasonably use the preventive means to avert the accident and his failure in that respect resulting in injury to the child will make the railroad company liable for the injury.

APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*Fenner, Henderson & Fenner* for Plaintiff, Appellee.

*Farrar, Jonas & Kruttschnitt* and *Thomas J. Semmes* for Defendants, Appellants.

Argued and submitted January 7, 1897.
Opinion handed down February 15, 1897.
Rehearing refused March 29, 1897.

The opinion of the court was delivered by

MILLER, J. The plaintiff sues for damages for injuries to his minor child struck by an electric car of defendant, thrown to the ground, and the wheels of the car passing over the legs of the child, rendering necessary the amputation of both, the petition charging that the accident was due solely to the gross carelessness of the defendant's agent, the motorman. The defendant's answer denies the imputed negligence, and alleges the accident was due solely to the fault and negligence of the child and its parents. Thereafter the defendant excepted that the petition disclosed no cause of action, which overruled, the case was submitted to the jury, and from the judgment based on their verdict against defendant for thirty thousand dollars, this appeal is prosecuted.

It is urged that the petition, containing no averment that the defendant could have prevented the act causing the damage, dis-

closes no cause of action. Civil Code, Arts. 2320, 2315, 2317. In the Napoleon Code the exemption relied on by defendant is denied to masters and confined to parents, teachers and artisans sought to be held for acts causing damage committed by children and apprentices in their charge. Napoleon Code, Art. 1384. The commentators on that Code maintain that masters must be deemed able, by selecting careful servants, to avoid all damages arising from their acts, and hence the French jurists reach the conclusion that inability to prevent the act can not be urgeo by masters when sought to be made liable for damages caused by their servants. Boilleaux thus states this view: "Ces derniers," referring to masters, "ne s'affranchiraient done point de l'obligation pèse sur eux, en offrant de pouver qu'ils n'ont pu empêcher le dommage; la loi les assujettit à la responsabilité la plus entière, ils doivent s'imputer d'avoir pris à leur service des gens méchant, maladroit, imprudents ou dont ils ne connaissaient par le moralité." 4 Boilleaux, p. 765; 2 Mourlin, p. 890.

The framers of our Code, however, have extended this exemption given by the Napoleon Code so as to give masters the same defence of inability to prevent the wrongful act of their servants, given by the Napoleon Code to parents, teachers and artisans. Civil Code, articles cited. But when a corporation is the employer, and is sued for the wrongful act of its agent, is not the failure of the corporation to exert its power of prevention, manifested by the act itself of the imprudent agent, whose act is that of the principal capable of acting only through its agents? The prevention the Code exacts, and the exercise of which it makes a shield for the employer against liability for his servant's acts, is obvious in its application to natural persons. But if the corporation acting only through agents, is to be exempted from liability for its agent's acts, on the theory that some preventive power must be shown beyond the selection of the incompetent agent, it would follow that no corporation could be made liable. The theory, in other words, would seem to exclude liability of corporations from that responsibility for the neglect and imprudence of its servants imposed by the laws on all masters.

The question raised by the exception of defendant is not new in our jurisprudence. In suits against individuals asserting their liability for acts of their agents, our courts have applied the exemption from responsibility unless there was averment and proof the

principal could and did not prevent the act; there are decisions exacting the same requirement to hold corporations, while in other, and especially the decisions of later years, the responsibility of the principal has been determined with no reference to averment or proof on this point.    Palfrey vs. Kerr, 8 N. S. 504; Strawbridge vs. Turner & Woodruff, 8 La. 537; Buel vs. New York Steamer, 17 La. 545; Collingsworth vs. Covington, 2 An. 406; Fitzgerald vs. Ferguson, 11 An. 396; Poree vs. Cannon, 14 An. 506.    But even in the earlier decisions applying the exemption of the master's liability for the servant's act, the distinction has been recognized between the principal, a natural person, and the corporate principal.    Judge Martin dealing with the charge of the lower court to the effect that this qualification of the master's liability in Art. 2299 of the old, now 2319 of the new Code, had no application to a corporation capable of acting only through its agents, and that part of the Code had been inserted inadvertently, sustained the charge, though not of the opinion the article had found its way into the Code by inadvertence.    Marlatt vs. Levee Steam Cotton Press Company, 10 La. 586.    In another case of similar character, this court, dealing with this part of our Code, observed it was calculated to do away with the responsibility of corporations, still was our law, but the corporation was absolved from liability on the ground that the act of its agent was a crime, and of course not within the scope of the functions entrusted to him.    Ware vs. Barataria and Lafourche Canal, 15 La. 169.    In Hart vs. New Orleans & Carrollton Railroad Company, 1 Rob. 181, this court held the lower court properly refused the charge that the master could not be held for the servant's act resulting in injury, without proof the master could have prevented the act and failed to do so.    In McCubbin vs. Hastings, 27 An. 716, and Van Amburg vs. Railroad Company, 37 An. 654, the last being a suit against a corporation, the exemption of the master's liability under consideration here was discussed and limited.    In the long line of decisions since the Hart case, the principle of that decision has been followed through without discussion, except that bestowed on it in the McCubbin case, 27 An. 716, and the Van Amburg case, 37 An. 654.    The reason the French jurists assign for denying to masters the exemption from liability accorded in our Code, that they must be presumed able to select competent agents, suggests that the ability to prevent the wrongful act of the servant is to be

deemed implied when the master is sought to be held for such acts. Whether guided by the reason of the French commentators or on the theory that the act of the corporate agent is to be regarded as that of the corporation, our jurisprudence, it seems to us, dispenses with the express averment in suits of this character that the corporation could have prevented the act of its agent and failed to exert that prevention.

The defendant claims that the testimony produced by plaintiff should have been excluded because containing no allegation that the child or those having him in charge did not contribute to the accident. On this point, we think the age of the child, and that he strayed from the banquette, stated in the petition, dispensed with greater particularity of statement. The petition alleging the accident was due solely to the gross carelessness and want of care and skill of defendant's agent, in our view, is a sufficient averment in that respect. Besides, the defendant claims the allegations of the petition are lacking in precision and fullness in regard to the manner of the collision; the relative position of the child and the car; because "the speed" of the child crossing the street and the car, are not given, nor the lack of proper signals or apparatus, is not charged, and other deficiencies are suggested. The petition avers the time, the place of the accident, that the child was run down by the car, his legs crushed by the wheels, and this was due solely to the carelessness of the motorman. There was no call for any greater detail of statement, but defendant joined issue. Under our system of pleading requiring a concise statement of the cause of action, we think the petition was sufficient, especially as no exception to the form of its statements was interposed.

The accident occurred on an evening in June, about 7:30 P. M. The car that struck the child, descending Magazine street, was of the kind called the "summer car," with steps on either side and seats ranged across the car. On that street, the width of which is thirty feet, there are the ascending and descending tracks; the descending track being nearest to the right, or river side of the street. The child had been playing on the banquette on the left, or wood side, and at or near the lower corner of Constantinople street. Leaving the banquette in his course to the opposite side, the child had strayed to a point in the street close to the line of rails nearest the wood side of the street of the descending track, and about ten feet

below the lower bridge or crossing from one to the other side of Constantinople street. At that point the child came in contact with the side step, near the front of the descending car, was thrown to the ground, his legs drawn under the wheels on the left side of the car, and crushed so as to require the amputation of both, the car running at its usual speed and going about a length beyond the spot of contact before its motion was arrested.

The defendant has produced the testimony of passengers in the car at the time of the accident, some seated on the side of the car where the accident occurred. From these witnesses, or those that could see we have the statement the child coming out from the wood side ran into the car; one testifies she saw him run into the side of the car, and felt, to use her words, as if she could stoop and pick him up. All these witnesses speak to the promptitude with which the motorman applied the brake and brought the car to rest in, say, forty feet from the lower] crossing of Constantinople street. Passengers, even if seated so as to see ahead, are not apt to bestow attention on objects near the tracks in their front. The witnesses testify to the preventive measures to stop the car, but this prevention was exerted when their attention was attracted by the cry of the motorman, an alarm, however, not given, and hence could not have been heard until the car was close to the child, we conclude about the upper crossing, and the child was struck, say, ten feet from the lower crossing. That the application of the brake was too late to avert the accident is demonstrated by the accident itself, and the fact the car went about its length beyond the point of contact. The passenger testimony does not, in our view, materially aid in the solution of the important question whether before the brake was applied the child should not have been perceived, and in time to spare him. Another witness for the defence testifies his attention was first attracted by hearing " Look out for the child!" The witness looked up and saw the child coming out near the second post below the corner; he ran out just below the crossing, when witness first saw the child; he was across the gutter and in the street; he kept going up and ran against the side step of the car. We conclude it was the cry of the motorman to which the witness refers, and that when the attention of the witness was thus attracted, the car was then about the upper crossing, the point, too, where the motorman puts the car when the child was first perceived. This

witness was seated on the steps of his residence about one hundred and fifty feet below Constantinople street, on the river side of Magazine street, and his opportunity of observation was the space, or rather moment between the cry that called his attention and the quickly succeeding contact; his view, too, was soon shut off by the car in its motion intervening between the witness and the child thrown down on the side of the car furthest from where the witness was seated. The motorman's account is, in substance, the car was about the upper crossing when he first saw the child; that he hallooed to a woman on the banquette come and take or catch that child, the witness' hand then on his reverse and brake; that the child made a "bulge" right across the street and hit the car on the step, and the witness locates the child about ten feet below lower crossing. Another witness for the defendant was on the river side of Magazine street, about fifteen feet from the Constantinople corner, watching the children playing on the opposite banquette; he testifies he saw the child leave the second post from the corner and "shoot" across the street; the car, the witness states, was then crossing Constantinople street with its fender on the down side, and he puts the child about twenty or thirty feet below the lower crossing; the witness was at once impressed with the child's danger when he saw him "shoot" across the street, the car so close at hand. The witness, we think, is mistaken in the distance he puts the child below the crossing. In another aspect his observation strikes us as inaccurate. He puts the car fender on the lower crossing when he saw the child "shoot across the street." A swift moving car, not called for any passenger to stop on the corner, moves through ten or even twenty feet in an almost unappreciable point of time. The witness' theory assumes that a two-year-old child, in that instant of time, could traverse say fifteen feet from the post on the banquette to where he was struck just outside the descending rail. The statement is, in our view at least, improbable. It must have been the mere glance on which the witness relies to state the relative position of the child and the car. His testimony would convey the inference the child could not have been seen, or that his movements not begun until the fender was on the lower crossing. But the concurrent testimony of the passengers when the motorman gave the alarm and his own testimony is that the car was on or about the upper crossing when the child was first perceived. There

is other testimony for the defendant, not presenting, however, any phase materially different from that indicated by the motorman and the witnesses whose statements we have condensed as of leading importance.

The plaintiff has produced the testimony of three witnesses, present at the time of the accident, one of whom, with greater particularity, testifies in effect, he observed the conduct of the motorman before he reached the corner of Constantinople street, say one hundred feet above that street; that his attention was not directed to the track in front until the car had gone nearly fifty feet beyond where witness first observed him; that witness heard him halloo and throw up his hands as if agitated; witness then looked for the cause of the motorman's halloo, and perceived the child coming across the street walking very slow, and he puts the child below Constantinople street, about twenty-five feet. The witness further testifies the motorman did not apply his brake promptly after his halloo, and places the distance from the point of the halloo to where the child was struck at sixty-two feet. The two other witnesses, observing the transaction from the same point as the first witness, gave confirmatory testimony. The deep significance of this testimony against defendant is obvious. It puts the child approaching the track close to which it was struck in full view of the motorman before he reached Constantinople street, and in ample time to stop the car, and the testimony places on him the responsibility for using no preventive means to arrest the car until he had gone the distance stated by the witness, with the result of striking the child sixty feet from the time his presence near the track or crossing the street was perceived by the motorman and aroused his alarm. The testimony has been assailed. The reason given by the witness for close observation of a motorman has been questioned. His statement of the conduct of the motorman hallooing and throwing up his hands has been contrasted with the testimony of the car passengers to his prompt action. The distance of the car from the child; that traversed by the car after the child was struck, the movement of the child and other particulars stated by the witness, it is urged on us are materially variant from the indisputable facts and the other testimony. It is insisted the testimony shows the witness was not in the position he indicates in describing the accident; that he introduced the child's father to counsel, and, in other modes,

32

aided the prosecution of this suit, all of which, it is contended, militates against his testimony. To all this urged in depreciation of the testimony we have given attention. We think the witness accounts for the notice of the motorman's movements, and we can not assume the cause he assigns, is fabricated. In connection with the variance of the witness' testimony and that of the car passengers to the conduct of the motorman, it weighs with us that the witness and the two others were in the motorman's front and the car passengers behind him; the attention of the passengers was attracted by the motorman's halloo; these witnesses for plaintiff state their observation preceded that alarm given by him. There is a discrepancy of the testimony of these witnesses for plaintiff and the other testimony as to distances, the movement of the child and in other respects, but witnesses with equal opportunities of observation are apt to differ as to such details, and yet be truthful in purpose. Between the witness' statement he was present and the contradiction on that point from one of the defence witnesses he was not, we must, it seems to us, adopt the affirmative statement. An eye-witness of a railroad accident injuring the child, due as the witness thinks to the carelessness of the motorman, is apt to have his sympathies enlisted and his interest aroused in the prosecution of a suit brought for the child. The part taken by the witness, in connection with or in aid of this litigation, does not, in our view, do more than create, perhaps, a partisanship for the side on which the sympathy of the witness exists, and that possible bias we have considered in connection with the testimony. But these witnesses stand before us, as they did in the lower court, unimpeached for veracity, the judge of the lower court taking occasion to declare his conviction of the failure of the attack on the testimony. Their testimony must, therefore, have the weight before us, with due allowance for variances in details, and attaching appropriate weight to the testimony in substantial respects.

There is besides the testimony of four persons seated on a bench on the lower side of Constantinople street in a position to see the child and the approaching car, at least, from the moment it appeared at or near the upper crossing of Constantinople street. The scream of a girl on the corner first attracted their attention. One of these witnesses testifies in effect, he turned at the scream, saw the child crossing the track, the dash-board of the car coming round (or to) the corner, the child was on the crossing, but along with this last

statement, is that the child was picked up ten feet from the crossing. Another testifies, in effect the child was in the street crossing, and in another place, in between the tracks and the car just coming from the up-town corner, but on a previous occasion he had stated the car was five feet away; another testified in effect, he saw the little one go (or walk) across the track, in another place he puts the child between the tracks, at that moment the car close by, he does say sixty or seventy feet away, but this is manifestly a mistake, as, in our opinion, from the witness' position he could not have seen the car at that distance; another of these bench witnesses states in substance, when the scream attracted his attention the car was on the up-town side, the child below the plank walk or bridge just about on a line with the property line, or three feet below, with the car in the position stated by him, the child was in between the tracks, the child looked back at the scream. There are other witnesses who testify to the course of the child, the point it had reached and the position of the car at the upper crossing. In our examination of the testimony, quite voluminous, we have been guided by its general bearing irrespective of minor variances and have applied by the correction afforded by the facts. The substantial concurrence of these bench witnesses is that the child was in the street on its course to the opposite side when they first saw him, and their testimony, we think, establishes with reasonable certainty he had neared, if not reached, the spot where he was struck, when the car was at the upper crossing. If the child had made that progress when the car reached the upper crossing there is an obvious support to that testimony which puts the child in the street before the car had reached that crossing. If so there is no satisfactory answer why he was not seen and the brake applied before the motorman states he first saw the child. Again, if the child had gone as far as indicated by the bench witnesses, at the moment the car reached the upper crossing, it is fatal to the theory of the sudden bulge across the street when the motorman on the upper corner first saw the child, and certainly leaves no room to suppose the child left the second post and "shot across" the street when the fender of the car was on the lower crossing. To our minds the testimony carries a persuasion difficult to resist that the child was in the street at or close to the spot he was struck before the motorman saw him, and our conviction based on the

whole testimony is that the child could and should have been seen by the motorman in time to avert the accident. The presence of a child of tender years within the plain view of the motorman, on or approaching the tracks under circumstances indicating the great danger of the child, imposes on the motorman the duty of prompt preventive measures to save the child. We have indicated our conclusions of the failure of this duty.

The case comes to us fortified by the verdict of the jury and accompanied with the opinion of the judge of the lower court refusing the new trial, evincing his careful consideration and conclusion that defendant is liable. The record exhibits questions of the credibility of witnesses and the weight of evidence, the solution of which is presumed to be aided by the better opportunities of the jury and judge before whom the witnesses testify. While this court has felt constrained in many cases to set aside verdicts manifestly erroneous and oppressive, still, in cases like this, it has been the rule not to disturb verdicts supported by the opinion of the lower judge, merely because of the conflict of testimony, or unless the verdict is palpably wrong. In view of the importance of the case and the earnestness with which it has been argued, we have not felt at liberty to rest on the weight due in a case of this peculiar character to the verdict or the opinion of the District Judge. The case has received, at our hands, the most careful consideration, and our appreciation is, that the judgment of the lower court, except as to amount, must stand.

The damages for an injury to the child deprived by the act of defendant's agent of both legs should be proportioned to his sufferings, and to that helplessness or dependence to which he is reduced and must endure to the end of his yet young life. As in all cases of damages for the loss of life or limbs, the measure of damages is a subject of difficult appreciation. We have considered the cases cited by defendant, and with an earnest desire to award suitable compensation, without oppression to the principal called on to answer for an agent's acts, we have reached the conclusion the judgment should be reduced to twenty thousand dollars.

In Ketchum vs. Railroad Company, 38 An. 778, for the loss of an arm this court allowed ten thousand dollars damages. In Peniston vs. Railway Company, 34 An. 777, for broken leg, six thousand dollars. In Barksdull vs. Railway Company, 23 An. 180, for both legs, fifteen

thousand dollars. In other cases of injuries, far inferior in character, allowances have ranged from fifteen hundred to seventy-five hundred dollars. In Choppin vs. Railway Company twenty-five thousand dollars was allowed for the loss of leg. In the Federal courts, for an injured foot, seventy-five hundred dollars was allowed; ten thousand dollars in another case was awarded for the loss of a leg, and in another case twenty thousand dollars were given for the loss of both legs. Railway Company vs. Stout, 17 Wall. 657; Railroad Company vs. Mares, 123 U. S. 710; Railway Company vs. Herbert, 116 U. S. 642. Guided by the circumstances of this case, and in the light of cases of injuries to limbs, it seems to us the damages we give can not be deemed excessive.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed, and it is now ordered, adjudged and decreed that the plaintiff, W. R. Nelson, for the use of his minor child, recover of the defendant, the Crescent City Railroad Company, twenty thousand dollars and costs.

### DISSENTING OPINION.

BREAUX, J. In view of the many decisions of this court, allowing amounts considerably less in suits *pari materiæ*, I am of the opinion that the amount allowed in this case is excessive, and therefore, as relates to the amount, I dissent from the decree.