**Herman J. KERN, Plaintiff and Appellant, v. N. O. PUBLIC SERVICE, Defendant and Appellee.**

**No. 14084.**

Court of Appeal of Louisiana. Orleans.
March 7, 1932.

George Piazza, of New Orleans, for appellant.

Ivy G. Kittredge, of New Orleans, for appellee.

JANVIER, J.

At about 7:30 at night, Kern, plaintiff, had just boarded one of defendant's street cars and was standing near the conductor on the rear platform, when the car was brought to a rather sudden stop because the wheels of the rear truck "split a switch" and refused to follow those of the front truck.

Kern claims that as a result of the jolt caused by the stop he was thrown violently against the upright bar near the center of the rear platform and that part of his body struck the emergency brake handle with the result that he was severely injured. The amount asked in his petition is $15,300.

Defendant maintains that when the car split the switch it was not derailed; that it was traveling at a very slow speed; that Kern was not thrown against any part of the car, but was braced by the conductor; and that he not only sustained no injuries at all, but made no complaint of any kind.

The district court rendered judgment for defendant dismissing the suit.

In argument before this court and in his brief, counsel for plaintiff contended that there should be judgment for his client, but he admitted that the record would not justify an award in excess of $735.

In view of the enormous claims presented in the petition, the voluntary reduction of the amount thereof to a sum comparatively so insignificant cannot be overlooked, and casts considerable doubt on the good faith of plaintiff and weakens the effect of his testimony in other particulars, because the issue presented depends solely upon the veracity of witnesses and through his entire testimony Kern's willingness to exaggerate and to misstate facts is strikingly evident.

The record is large. We have given to it most careful consideration, and we deem it unnecessary to say more than, even if there had been no testimony other than that given by Kern himself, it would have been most difficult to believe that he sustained any injuries as the result of the slight jolt which occurred, and in view of absolute proof to the contrary we need do no more than state that plaintiff's story is entirely disproved by the countervailing evidence.

The judgment appealed from is affirmed.

Judgment affirmed.

**FARQUE v. GULF STATES UTILITIES CO., Inc.**

**No. 919.**

Court of Appeal of Louisiana. First Circuit.
March 8, 1932.

Pujo, Bell & Hardin, of Lake Charles, for appellant.

Hawkins & Pickrel and C. V. Pattison, all of Lake Charles, for appellee.

ELLIOTT, J.

This is a damage suit by Gus Farque, for the use and benefit of his minor son Warren Alfred Farque, against Gulf Utilities Company, Inc., in which the amount claimed for his son is $45,000, and $152 for himself on account of physician's fees and other expenses due to injury received by his son.

Gulf States Utilities Company, Inc., sells and delivers ice by retail to customers from wagons in Lake Charles. For the purpose of its business it operates wagons pulled by horses. A wagon loaded with ice is accompanied by two employees, one of whom has charge of the sale and delivery; the other is his helper.

One of its delivery wagons in charge of Harry Roth, with Thomas Di Giovani as helper, on August 15, 1929, at about the hour of 11 a. m., stopped and delivered a small quantity of ice to Mrs. Barker, mother-in-law of plaintiff and grandmother of Warren Alfred Farque. She was seated at the time on the front porch of her house with Warren Alfred Farque, three years and nine months of age. Mr. Roth brought some ice in one hand which he delivered to Mrs. Barker and brought at the same time in his other hand for her grandson a hand full of ice snow, and delivered it to him on the porch.

Ice snow is the small particles of ice cut out by the saw in sawing up a block of ice. Children are fond of this snow, and, when defendant's wagon passes along the streets stopping at the various houses to deliver ice, children are in the habit of coming out to the wagon to get the snow.

When Mrs. Barker received from Roth the piece of ice she had bought, and her grandson had received the ice snow, she spoke to her grandson within the hearing of Mr. Roth, saying: "You stay here until grandmother puts up her ice and I will bring you a glass and spoon and sugar and we will eat sherbert on the front porch." Upon which she went back into her kitchen to put up the ice, leaving her grandson on the porch, the wagon moving on at the same time to the next door where it stopped and delivered ice, thence going on to the third house approximately 100 feet and perhaps more distant from Mrs. Barker's, where it stopped and Thomas Di Giovani commenced sawing off ice to be delivered. While his helper was thus engaged, Mr. Roth was standing at the rear end of the wagon with his ice pick in his hand, the point of the pick, pointing backward, waiting for the piece of ice to be cut off. Plaintiff's son, Warren Alfred Farque came up behind him, with the result that his eye came in contact with the point of the ice pick and was destroyed.

An ice pick is a sharp pointed instrument 8 or 9 inches long used in handling ice.

Plaintiff alleges that the injury received by his son resulted from the negligent custom pursued by defendant through its employees, in giving ice snow to children from its wagon, their further negligence in inviting his son to follow the wagon to get snow, and the final and further negligence of its employee Roth in handling his ice pick.

The plaintiff mainly sets out his cause of action in averment 8 of his original, and 19 of his amended and supplemental, petition.

In averment 8 he in effect says that his minor son was invited by defendant's employee, who brought the ice to the house, to follow the ice wagon to the next house and receive the ice snow that would form when the ice was sawed to make a delivery at the next house, and that his minor son was permitted to and did follow said vehicle there, and that in accordance with said custom, established and continued by defendant and its employees, as set out herein, his minor son was permitted to and did follow said vehicle there for the purpose aforesaid, and that, while waiting there by the side of the vehicle to receive from defendant's employee the ice snow, defendant's employee carelessly and negligently stuck the ice pick he had in his hand in the left eye of petitioner's son.

In article 19 of his amended and supplemental petition, he avers: That at the time

of the occurrence set out in article 8 of the original petition defendant's agent, servant, and employee, after inviting petitioner's minor son to come to his wagon to receive crushed ice and after sawing the ice and using his pick on it, scooped up some of the crushed ice in his hand, and, with the ice pick in his hand, and the point of the pick pointing backward, swung around upon petitioner's minor son to give him the crushed ice, without removing the pick from his hand or turning the point in another direction or first looking to see how close to him petitioner's minor son was, and plunged the point of the pick in the left eye of petitioner's son, destroying the sight of his eye.

Defendant denies liability. It admits that its employees gave ice snow to children from its wagon, but denies that its employees were negligent for doing so. It avers that it was not done for the purpose of attracting them to the wagon, but because it could not keep them away without force, which its employees refrained from using. That they would come to the wagon and its employees gave them the snow to get rid of them, admonishing them, when giving them the snow, to go away and keep away from the wagon. That its employees were without fault. That they did not know and had no reason to believe that the child had followed the wagon and come up behind them without word or noise. That he came into contact with the point of the ice pick before its employees knew he was there. That its employees were not guilty of any negligence that resulted in the injury received by his son.

There was judgment in favor of the plaintiff for the use and benefit of his son in the sum of $8,000, and in favor of plaintiff individually for $100. Defendant has appealed.

The plaintiff has answered the appeal and prays that the judgment appealed from be increased to $12,000.

Plaintiff's action is based on the articles of the Civil Code, which provides:

"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it. * * *" Article 2315.

"Every person is responsible for the damages he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill. * * *" Article 2316.

"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." Article 2317.

"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed. * * *"

"In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it." Article 2320.

This last clause which purports to modify the previous provisions of the Civil Code on the subject of responsibility has been a ground for controversy, and the Supreme Court has ruled contradictorily on the subject. It was held in some early cases that this modification must be given effect, and there are cases in which it was done, but in later cases it was held to be the established jurisprudence that this modification of article 2320 was in conflict with other provisions of the Code and could not be given effect. Nelson v. R. R. Co., 49 La. Ann. 491, 21 So. 635; Anderson v. Elder Dempster & Co., 105 La. 672, 30 So. 120; Weaver v. Goulden Logging Co., 116 La. 468, 40 So. 798; Ragas v. Douglas, 139 La. 773, 72 So. 242.

■ It is useless to discuss the act of the child in leaving the porch and following the wagon, because a child the age of plaintiff's son could not be guilty of negligence.

There is considerable testimony concerning the giving of ice snow from the wagon to children on the street and the habit of children in coming to the wagon to get the ice snow. There is some testimony to the effect that children were invited to come to the wagon and get snow. Plaintiff testified that his child had been invited to do so. His testimony on the subject is as follows:

"Q. You never knew of Mr. Roth or any of the other ice men, inviting children to come out and get ice? A. Yes, Sir.

"Q. Inviting them to come and get it? A. Yes, Sir.

"Q. Where were they when they were invited to come out and get ice? A. 117, my mother-in-law.

"Q. Whose child? A. Well, my child.

"Q. Where was he at the time he was invited to come and get it? A. Sitting on the porch of my mother-in-law's house.

"Q. Was that before this happened? A. Yes, Sir.

"Q. Who invited him? A. Mr. Roth."

Mr. Roth testified that plaintiff's child and many others had been in the habit of coming to his wagon to get ice snow and that he gave them snow, but he denied that he had ever invited this child or any other child to come to the wagon. The testimony of his helper Di Giovani is to the same effect.

Defendant's employees had been instructed not to invite children to come to the wagon, but were told at the same time not to strike nor use force against them. Our conclusion is that children customarily came and received ice snow, but their coming was not due to any invitation express or implied, and that

defendant's employees gave them snow, only because they could not keep them from coming and as the best way to get them to go away, admonishing them when they received the snow to go away.

But that has very little to do with the fact that the plaintiff's child, so young as to make it remarkable, got down off the porch where it had been given snow and where its grandmother had told it to stay until she returned with glass, spoon, and sugar, and followed after the wagon, a distance upwards of 100 feet. If Mr. Roth thought about it at all, he naturally supposed that the child would remain where he had left it with snow in its hand.

We quote from the testimony of Roth:

"Q. Did you ever know of anyone standing up with an ice pick behind him, with a bunch of children behind him? A. No, Sir.

"Q. You probably would not do it again would you? A. No, Sir. I would stick it up in the tail gate or somewhere, because I would rather it had been in my own eye than the child's.

"Q. As a matter of fact Mr. Roth, in handling these tools as you do every day, that there are children around you frequently, it was extremely careless to have an ice pick sticking behind you, was it not? A. Yes, Sir. But like I told you, Tommy was in between me and the place I put my pick. Some days I would chip him another 50. I may chip one or two pieces.

"Q. The reason you did have the pick sticking out there in that careless manner was because Tommy was behind you and the place where you kept it, where it was safe, wasn't it? A. Yes, Sir.

"Q. Did you ever invite the child to come down and get ice before that? A. No, Sir.

"Q. As a matter of fact this child was more or less a pet of yours on the route, wasn't he? A. All children are my pets. I like them all.

"Q. But it wasn't uncommon for this child and other children to congregate around there when you were sawing ice, waiting for the ice to be sawed so they could get the snow? A. Yes, Sir. They all do. We tell them to get away but it don't do a bit of good in the world."

Referring to the above questions and answers, the lower court says:

"Here Roth had constructive knowledge of the presence of the boy, present by express or implied invitation. He handled a dangerous tool in a manner different from that provided by the company, in a manner he admitted was negligent, and since he stuck the pick in a place where the children always placed themselves and without looking, he was highly negligent."

We think the lower court took an erroneous view of these questions and answers. At the time of the accident Roth was standing at the rear of the wagon, pick in hand, with the point pointing backwards; but the questions assume in a leading way that he was aware that there might be a child behind him. It directly appears from other parts of his testimony, before and after answering these questions, that an assumption of the kind is not justified.

The evidence shows that there were no children around the wagon at the time in question, that the only parties at the wagon were Roth and his helper, and that this child came up behind him, without his knowledge, or that of his helper, and without him having any reason to suppose or expect that it or any other child was anywhere about. Under the circumstances disclosed by his testimony and that of his helper, it was not negligent for him to be standing at the time in question, at the rear of the wagon, pick in hand, the point pointing backward, waiting for his helper to cut off a piece of ice to deliver to a customer.

The evidence does not show how the child came to be hurt. It cannot be stated from the testimony whether the child struck its own eye against the point of the pick, or whether Mr. Roth, by some movement of his hand, caused the point of his pick to strike the child in its eye.

Nobody says how it happened. Mr. Roth testifies that the first knowledge he had of the presence of the child was when he felt his pick strike something, upon which the child screamed. We can find nothing in the testimony that can reasonably justify a conclusion that Roth by word or act was responsible for the presence of the child behind him, or that he or his helper knew that this or any other child might be near them at the time in question.

The opinion further says: "In telling about the accident, Roth said he stuck the pick in the boy's eye." This finding is based on the testimony of Mrs. Barker. In relating what Mr. Roth said when he brought her the child, she gave the following version as to what he told her:

"Mr. Roth brought him to my house, inside of my house, and told me that the child got hurt and he told me that he done it; that he stuck him in the eye with his ice pick. He was sawing ice when he chipped the ice with his pick. He put his arm down and the baby was behind and that is where he struck the baby in the eye."

Mr. Roth's version of the matter as a witness on the trial is as follows:

"Q. What first attracted you to the little boy? A. When I felt the pick jar.

"Q. Did he immediately scream or give any alarm? A. Yes, Sir, he hollered. I felt the pick jar and I heard the child holler.

"Q. Immediately after he was hurt what did you do? A. I picked him up and carried him to his grandmother and told her the child got struck."

Subsequently asked if he did not say to Mrs. Barker when he carried the child to her that he had hurt the baby, that he had struck him in the eye, and that the baby was behind him and he was picking the ice and when he brought down his arm the pick went in the child's eye, and his answer was "No, Sir."

Further questioned, he said:

"Q. Did the child, after he was struck in his eye, touch you with his hand? A. No, Sir. Just as he ran into the pick I dropped the pick and the child was crying and I picked it up.

"Q. You mean to say the child ran into the pick? A. Yes, Sir.

"Q. That is correct, is it? A. Yes, Sir right on the side."

The witness Di Giovani was asked questions and gave answers as follows:

"Q. Now, as a matter of fact Mr. Roth was in the act of handing the child the ice snow when the child was struck in the eye, was he not? A. He was in the act at that time.

"Q. Yes? A. No, Sir. He didn't know he was back there. Both of us didn't even know he was back there.

"Q. What were you doing at the time the child was struck in the eye? A. I was cutting ice."

The testimony of Mrs. Barker, repeating what Mr. Roth said to her, is regarded by all law writers as weak testimony, and courts are admonished accordingly.

Greenleaf says:

"With respect to all verbal admissions it may be observed that they ought to be received with great caution. The evidence consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake."

The author has more to say along the same line. Greenleaf, vol. 1, p. 229, § 200. Starkey, § 52, p. 461 et seq. Jones, p. 370, § 295. Wigmore, vol. 3, pp. 2821, 2822, § 2094. The weakness of such testimony has been the subject of comment by the Supreme Court of this state.

█ It is our conclusion that the testimony of Mrs. Barker in repeating admissions which it is claimed Mr. Roth made to her is not sufficient to outweigh his testimony denying that he made the admissions imputed to him.

The position which defendant takes in its brief is that a person is not in any way negligent when not suspecting and without cause to suspect that a child would leave the house of its parents or of others having its custody, contrary to express known parental command, and in possession of known inducements to remain where it was left, and follow such person down the street.

█ Prudence requires no man to anticipate what is not reasonably to be expected, and what he has no reason to believe would occur. Miller v. St. Charles St. R. Co., 114 La. 410, 38 So. 401 and Blum v. Weatherford & Cary Bros., 121 La. 298, 46 So. 317.

██ One is not liable for the sudden act of a child. One cannot foresee or guard against all danger incident to the rashness of children and are not insurers of their lives or safety. Klein v. Crescent City R. Co., 23 La. Ann. 729; Montfort v. Schmidt, 36 La. Ann. 750; Gannon v. New Orleans City & L. R. Co., 48 La. Ann. 1004, 20 So. 223; Culbertson v. Crescent City R. Co., 48 La. Ann. 1376, 20 So. 902; Campbell v. New Orleans City R. Co., 104 La. 183, 28 So. 985; Biegel v. New Orleans, 143 La. 1078, 79 So. 867. The facts of the present case bring it within the rule stated by the decisions.

It is a dictate of the highest humanity to protect children and not take into account the fault or negligence of the parents who permit them to go on the highway, particularly when the parents are poor and unable to employ a nurse. But it must appear, in order to apply this high principle of humanity, that defendant was at fault. Blum v. Weatherford & Cary Bros., 121 La. 298, page 305, 46 So. 317.

██ In order to warrant the finding that negligence is the proximate cause of the injury, it must appear that the injury was the natural consequence of the negligence, and that the defendant ought to have anticipated or foreseen or expected it in the light of the attending circumstances. Palermo v. Orleans Ice Mfg. Co., 130 La. 833, 58 So. 589, 40 L. R. A. (N. S.) 671.

One is not liable to children for negligence in carrying on their business, beyond what would be their liability to others equally free from blame. Peters v. Pearce, 146 La. 902, 84 So. 198.

In the present case, fault and negligence on the part of the defendant, resulting in the loss of the eye of plaintiff's child, does not appear. Therefore the judgment in favor of the plaintiff and against the defendant is erroneous and contrary to the law and the evidence.

For these reasons the judgment appealed from herein is annulled, avoided, and set aside, and the demand of the plaintiff is now rejected at his cost in both courts.