Miss Emily Walsh sustained painful and permanent injuries when she fell on the floor of the office, No. 1303 Whitney National Bank Building, occupied by her employer, the Pan-American Life Insurance Company. Alleging that her fall was due to the negligence of the Whitney National Bank in maintaining the floors of her employer's office in a dangerous and slippery condition due to the excessive use of wax, she brought this suit against it for $9,372.38, as damages.
The defendant admitted that Miss Walsh fell as alleged in her petition, but denied that it was in any way responsible therefor and, in the alternative, pleaded contributory negligence.
There was judgment below in plaintiff's favor in the sum of $1,237.38 and the defendant has appealed. The plaintiff has answered the appeal and asked that the amount awarded be increased to the sum prayed for.
Miss Emily Walsh was a clerk in the office of the Pan-American Life Insurance Company, where she had been so employed for about twenty years. The Pan-American Life Insurance Company leases its offices from the Whitney National Bank of New Orleans, which maintains the floors.
On January 10th, 1940, while plaintiff was walking from one part of her office to another, she slipped and fell to the floor. Seven employees of the Pan-American Life Insurance Company and one former employee testified in Miss Walsh's behalf. These witnesses, without exception, declared that the floor was dangerously slippery on the day Miss Walsh fell and that it had been in that condition for several months before and several months after the accident. Many of them declared that at one time or another they had slipped on the floor and several of them had fallen. For example, Mrs. Dolly Chilton testified as follows: "My foot flew from under me just a few weeks before Miss Walsh fell. I don't remember the exact date, but both my feet flew from under me and I fell full length and hit on the back of my head."
Miss Jessica Jeffs when asked if she had ever slipped on the floor answered in the affirmative, saying: "Well, I had two slips that were bad. I had one where I was going headlong and reached out and caught a desk and it caused quite a disturbance in the office, and another time some young man right near caught me when my feet were going out from under me, and a number of other small slips that frightened me."
When asked whether she had seen others fall she replied: "I have seen them stagger and do acrobatics to keep from falling."
Mr. L.A. Bienvenue, a former employee of the company, stated that he was present when Miss Walsh fell, and when asked if he had seen anyone else fall replied: "A couple of them. I have seen people walk down there and maybe slip and catch those desks, and I have heard them complain".
Miss E. Weinstein testified that she slipped several times, but fell only once. She saw others slip many times.
Miss Lucille Cazes stated that she slipped on the floor at the same spot that Miss Walsh fell the week following Miss Walsh's accident, but did not fall because she caught onto the desk. She saw others slip and one girl, she thought, was going to go through the wall.
The defendant strenuously objects to the introduction of evidence concerning the falling of other persons before and after Miss Walsh fell upon the ground that it was res inter alios acta. We are referred to no authorities in support of this proposition and, on our part, we believe the objection to be without merit. Auzene v. Gulf Public Service Co., La.App., 188 So. 512; Greeves v. S.H. Kress Co., La.App., 198 So. 171; Lawson v. D.H. Holmes Co., Ltd., La.App., 200 So. 163; 45 Corpus Juris, verbo "Negligence", Section 811.
The defendant uses on its floor a preparation called "Car-Na-Var", which is described by Mr. R.C. Knight, former district representative of the manufacturer, as a "spirit emulsion material, the main ingredient being No. 1 Carnauba wax. In addition to that, the other ingredients are vegetable and mineral gums which are put in primarily to take, to eliminate the slipperiness of the material. The solvent material is either a gasoline or a derivative of kerosene; painter's naptha, mineral spirits, or one of that *West Page 555 
character. I am not in a position to state which it is."
This preparation was applied to the floor periodically and had been put on the floor in question on the night of January 7th, 1940, three days before the accident. According to Elmo Remy, the porter of the Whitney Building, after applying Car-Na-Var to the floor, it is allowed to dry for about an hour when it is "buffed", which process is described as a polishing by a heavy machine with revolving discs, operated by electricity.
Douglas A. Booth, night superintendent of the building, testified that the buffing is repeated every thirty to forty-five days. In the meanwhile the floor is scrubbed with a soap called "Helm-O-Shine" and polished again. The result, according to the testimony of Knight, Booth and Remy, is no more slippery than any hardwood or polished floor might be expected to be, there being no excess of wax on the surface.
There was a "Ditto" machine, in the office which is the object of counsel's suspicion. We do not know what a ditto machine is and confess to some disappointment because the record does not enlighten us. All we are told about it is that water is used in its operation and it is suggested that some of the water may have gotten on the floor and added to its slippery surface, but the evidence shows that it seldom leaked and but little water dripped when it did. Moreover, a rubber pad had been placed under it to catch the water.
It must be conceded that office buildings, department stores and other places where uncovered floors are in use must employ some method of cleaning and polishing them, and that a surface of that character does not provide a footing as safe as a covered floor, a carpeted one for example. The writer of this opinion is old enough to remember the time when all floors in public and private use were carpeted as a standard practice, thus insuring a maximum of safety. In those days suits such as this were unknown. But this, like many other excellent customs of the past, has "gone with the wind". Perhaps, an elderly gentleman may be pardoned the "passing tribute of a sigh" for the departed. However, bare floors are now fashionable and the proprietor of an office building or a store with understandable adaptability, offers the public what it wants, uncarpeted floors, polished and greased floors, floors treated with "Car-Na-Var" which, incidentally, is shown to be an expensive preparation, widely used. It contains wax, the best of wax. It also contains "vegetable and mineral gums" which tend to offset the slippery character of the wax. No justifiable criticism or legal fault or negligence can be imputed to the building proprietor on this account, but his floors must be reasonably safe, such safety as is consistent with the conditions obtaining. It is not, in the nature of things, that a bare, polished and greased floor should be as safe as a carpeted floor, but in the instant case the floor was not reasonably safe. On the contrary, it was unreasonably dangerous. It was as slippery as the "path to perdition". Those who were required to use the floors apparently maintained the perpendicular at the expense of complete immobility. The slightest movement was involved with the greatest peril. Men and women executed marvels of acrobatic feats in their effort to avoid disaster. The wax on the floor was so thick that one of the ladies in the office, Miss Jessica Jeffs, kept an emery board in her desk to remove the excess wax from her shoes. After Miss Walsh fell there were streaks on the floor similar to the skid marks of an automobile.
The condition of the floor had been the subject of repeated complaints to the building authorities. In fact, the testimony of the witnesses concerning the dangerous and slippery character of the floor in the office of the Pan-American Life Insurance Company, was almost grotesque. Regardless of what has been said about the preparation "Car-Na-Var" and its universal use, the fact remains that these floors were exceedingly dangerous. Either the Car-Na-Var was unfit for the use it was put to or it was improperly applied. There is not the slightest refutation of the testimony of the employees of the Pan-American Life Insurance Company concerning the condition of the floor.
This is not a case such as was considered by us in Powell v. L. Feibleman Co., Inc., 187 So. 130, cited by counsel, where we held that a customer could not recover from a storekeeper for injuries sustained as the result of slipping on a banana peel in the store, it appearing that the storekeeper had exercised reasonable care to keep the premises in safe condition, and there was no evidence as to how or when the peel was placed on the floor.
Nor is it similar to the conditions obtaining in Greeves v. S.H. Kress Co., 198 So. 171, 172, where we said: *West Page 556 
"After all is said and done, the crucial question is whether the floors of defendant's store, at the time the plaintiff fell, were safe for the use of customers without subjecting them to the danger of injury by slipping and falling. The contention of the plaintiff is that the floor was greasy and slippery and that of the defendant to the contrary.
* * * * * *
"Thousands of people passed over the floors of the defendant's store, without slipping, between the time of the last application of Mycosheen and the day of the accident. This is a circumstance, by no means conclusive, but it must, nevertheless, be considered in determining the question of fact involving the condition of the floor".
Here the situation is somewhat like that which was under consideration in Redon v. Standard Accident Insurance Company, La. App., 161 So. 762, where we held a storekeeper liable for injuries sustained by a customer who slipped and fell because of a grease spot on the floor, the presence of which was held to be due to the storekeeper's negligence.
Defendant has pleaded contributory negligence upon the ground that since the floors were known to be slippery, plaintiff should have used such care as the situation required to prevent a fall. Her employment compelled her to walk on these floors and, according to her testimony, she contends that she did so as carefully as she knew how. The fact that they had long been in a dangerous condition was, from the evidence we take it, well known to her, but she could not be expected to be constantly on her guard against this ever present danger, however long continued.
In Huber v. American Drug Stores, 19 La.App. 430, 140 So. 120, 121, we said:
"In order for a person to be guilty of contributory negligence, he must `knowingly, or with negligent ignorance, voluntarily, and unnecessarily expose himself to it.' Thompson's Commentaries on the Law of Negligence, vol. 1, p. 184.
"In the case of Dennis Clements Wife v. Louisiana Electric Light Co., 44 La.Ann. 692, 11 So. 51, 53, 16 L.R.A. 43, 32 Am.St. Rep. 348, the court said:
"`Even in the presence of a known danger, to constitute contributory negligence it must be shown that the plaintiff voluntarily and unnecessarily exposed himself to it, unless it is of that character that the plaintiff must assume the risk from the very nature of the danger to which he is exposed.'"
Miss Walsh, in our opinion, was not guilty of contributory negligence.
Plaintiff, who was fifty-one years of age, sustained a broken hip as a result of the fall. She was confined to bed for four weeks. Her left leg is permanently shortened about two inches. Dr. Lucien Landry, her physician, testified that it would remain in that condition for the balance of her life. She incurred a doctor's bill of $150 of which amount she only claims $100 in her petition. Due to her inability to use the street car, she incurred a taxi bill in the sum of $127.38.
Under the circumstances it seems to us that $1,237.38 is inadequate. Plaintiff and appellee in answer to the appeal has asked that the award be increased and we have concluded that for all items of damage to allow the sum of $5,000.
For the reasons assigned, the judgment appealed from is amended by increasing the amount awarded below from $1,237.38 to $5,000, and, as thus amended, it is affirmed.
Amended and affirmed.
JANVIER, J., concurs in decree.