Philomena Grace **WILLIAMS**, Appellant,

v.

**EMPLOYERS LIABILITY ASSURANCE CORPORATION, LIMITED,**
Appellee.

No. 18340.

United States Court of Appeals
Fifth Circuit.

Nov. 17, 1961.

# 570

---◆---

John W. Bryan, Jr., New Orleans, La., for appellant.

James H. Drury, New Orleans, La., for appellee.

Before TUTTLE, Chief Judge, and BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This appeal raises a bizarre question bearing on absolute liability. Article 177 of the Louisiana Civil Code imposes liability on the master of a house for things thrown out of the house. The question for decision is the applicability of Article 177 to an action against the owner and the manager of an office building by an invitee sexually assaulted within the building.

Liability without fault [1] is a sturdy, ubiquitous, long-lived doctrine that can

---

1. There is an immense literature on liability without fault. Prosser on Torts (2d Ed.1955) p. 14 points out that toward the close of the nineteenth century noted writers attempted "to construct a consistent theory of tort law upon the basic principle that there should be no liability without fault, involving a large element of personal blame." He cites Holmes, The Common Law, 1881, 144–163; Smith, Tort and Absolute Liability, 1917, 30 Harv.L.Rev. 241, 319, 409; Salmond, Law of Torts, 7th Ed.1924, 11. Industrial and social changes, workmen's compensation laws, Rylands v. Fletcher, the automobile and the airplane, dangerous instrumentalities inescapably associated with modern life, and many other factors have riddled the principle of liability based on fault. For a sampling of the many articles and books on the subject see: Wigmore, Responsibility for Tortious Acts 7 Harv.L.Rev. 315 (1894); Ames, Law and Morals, 22 Harv.L.Rev. 97 (1908); Smith, Sequel to Workmen's Compensation Acts, 27 Harv.L.Rev. 235 (1915); Thayer, Liability Without Fault, 29 Harv.L.Rev. 801 (1916); Isaacs, Fault and Liability, 31 Harv.L.Rev. 954 (1918); Feezer, Capacity to Bear Loss as a Factor in the Decision of Certain Types of Tort Cases, 78 U.Pa.L.Rev. 805 (1930), 79 U.Pa.L.Rev. 742 (1931); Seavey, Speculations as to "Respondeat Superior," Harvard Legal Essays 433 (1934); Ehrenzweig, Negligence Without Fault (1951); Leflar, Negligence in Name Only, 27 N.Y.U.L.Rev. 564 (1952); McNiece and Thornton, Is the Law of Negligence Obsolete? 26 St. Johns L.Rev. 255 (1952). See also Prosser on Torts (2d Ed.1955), Chapters 11 and 12; 1 Pound, Jurisprudence (1959) 445–448; 1 Harper and James, The Law of Torts (1956). For articles in English on the civil law approach, see Lawson, Negligence in the Civil Law (1950) 43–50; Surveyor, Comparison of Delictual Responsibility in Law in Countries Gov-

be traced back to primitive notions of liability based on a person's relation to the instrumentality (thing, ward, servant, or slave) that causes injury, irrespective of fault.[2] Late in the long history of the doctrine, the praetorian quasi delict known to Justinian as *dejectum effusumve aliquid* [3] gave rise to an action against the occupier of a house, whether owner or not, for damage caused by anything being thrown or poured from the house. It was considered a quasi delict [4] because the obligation arose without any kind of fault on the part of the occupier. It survives as a "quasi offense" in Article 177 of the Louisiana Civil Code. This article reads:

"The master is answerable for the damage caused to individuals or to the community in general by whatever is thrown out of his house into the street or public road, and inasmuch as the master has the superintendence and police of his house, and is responsible for the faults [5] com-

erned by a Code, 8 Tul.L.Rev. 53 (1933); Walton, Delictual Responsibility in the Modern Civil Law, 49 L.Quat.Rev. 70 (1933); Takayanagi, Liability without Fault in the Modern Civil and Common Law, 16 Ill.L.Rev. 116 (1921), 17 Ill.L. Rev. 185 (1923).

For Louisiana law see Harris, Liability Without Fault, 6 Tul.L.Rev. 337 (1932); Miller, The Master-Servant Concept. 1 Loyola L.Rev. 25 (1941); Stone, Tort Doctrine in Louisiana: From What Sources Does It Derive?, 16 Tul.L.Rev. 489 (1942); Stone, Tort Doctrine in Louisiana: The Materials For the Decision of a Case, 17 Tul.L.Rev. 158 (1942); Stone, Louisiana Tort Doctrine: The Concept of Fault, 27 Tul.L.Rev. 1 (1953); Oppenheim, Survival of Torts Actions, 16 Tul.L.Rev. 386, 402–404 (1942); Note, Offenses and Quasi-Offenses, 26 Tul.L. Rev. 394 (1952).

2. "The doer of a deed was responsible whether he acted innocently or inadvertently, because he was the doer; the owner of an instrument which caused harm was responsible, because he was the owner, though the instrument had been wielded by a thief; the owner of an animal, the master of a slave, was responsible because he was associated with it as owner, as master; * * *." Wigmore, Tortious Responsibility, 7 Harv.L. Rev. 315 (1894); 3 Select Essay in Anglo-American Legal History (1909) 474, 480. "Primitive law asked simply, 'Did the defendant do the physical act which damaged the plaintiff?' The law of today * * * asks the further question, 'Was the act blameworthy?' The ethical standard of reasonable conduct has replaced the unmoral standard of acting at one's peril". Ames, Law and Morals, 22 Harv.L.Rev. 97, 99 (1909).

3. Inst. 4, 5, 1–2; Dig. 9, 3.1, pr.

4. The Louisiana Code follows the French Code in not defining délit (offense and quasi-délit (quasi offense). Pothier's definition is: "On appelle délit le fait par lequel une personne, par dol ou malignité, cause du dommage ou quelque tort à un autre. Le quasi-délit est le fait par lequel une personne, sans malignité, mais par une imprudence qui n'est pas excusable, cause quelque tort à un autre." Pothier, Traité des obligations I (1821) no. 116, p. 158. "Injury *(delictum)* is when a person by fraud or malignity causes any damage or wrong to another. ¶ *Quasi delicta*, are facts by which a person causes damages to another, without malignity, but by some inexcusable imprudence." Pothier On Obligations (Evans trans. 1853) p. 164. "[Quasi-Delicts] They were all of praetorian origin and do not appear as a separate class of obligations prior to the time of Justinian, * * *. Quasi delicts were actionable wrongs which were not included in the list of delicts covered by the statutory actions of the jus civile. They were moreover, wrongs not resulting from the malice of the offender, but rather from his fault, ignorance, or negligence." Burdick, Principles of Roman Law and Their Relation to Modern Law (1938) 505. See Buckland, A Manual of Roman Private Law (2d ed.1953) 331; Buckland, A Treatise on Roman Law (2d Ed.1932) 589; Radin, Roman Law (1927), 159; Howe, Studies in the Civil Law (1896) 191–217; Oppenheim, Survival of Tort Actions, 16 Tul.L.Rev. 386, 402; Stone Tort Doctrine in Louisiana, 17 Tul.L.Rev. 159 (1942); 27 Tul.L.Rev. 1, (1952); Note, Offenses and Quasi-Offenses, 26 Tul.L.Rev. 394 (1951).

5. Fault is not defined in the Louisiana Civil Code nor is it defined in the French Civil Code, apparently in order to keep the concept fluid. Howe equates the term with unlawful conduct. Howe, Studies in the Civil Law (1896) 194. For a discussion of the civilian approach in Louisiana and France, see Stone, Tort Doc-

mitted therein." La.Civ.Code of 1870, as amended.

A corresponding provision may be found in many codes.[6]

The plaintiff was criminally attacked by an intruder in a ladies' dressing room of an office building. She sued the owner and the operator of the building for damages.[7] The jury found for the defendants. The plaintiff appeals, mainly on the ground that the trial judge erred in refusing to instruct the jury with regard to the effect of Article 177. We agree with the trial judge that Article 177 is inapplicable to the facts of this case.

## I.

On a Saturday morning in March 1957 the plaintiff, Mrs. Philomene Williams, a widow forty-three years old, reported for her first day of work at a new employer's office in the Pere Marquette Building. This is a large office building in the center of the New Orleans business district. Jesuit High School Corporation owns the Pere Marquette Building and leases it to a building management company, Barcom Corporation. About two o'clock in the afternoon Mrs. Williams went to the ladies' dressing room on the fifth floor, unlocked the door, and entered the room. She saw no one. A few moments later, a tall youth followed her into the room before the door could close. Armed with a knife and using a handkerchief as a mask, he forced her to submit to a sexual assault. Several months later, New Orleans police found and arrested the assailant, a juvenile fourteen years old. He admitted the crime. Counsel for the parties stipulated that if the assailant were called to testify he would corroborate Mrs. Williams's testimony as to the attack.

Mrs. Williams suffered physical injury, shock, and severe nervous disorders requiring psychiatric treatment. She sued for damages in the amount of $150,000, alleging that her injuries, pain, suffering, and humiliation resulted from the defendants' negligence in failing to "take any steps properly calculated to reasonably protect the public from such assaults." This allegation of negligence indicates the plaintiff's uncertainty whether the claim is under the basic torts law of Louisiana, Article 2315,[8] or under Article 177, an uncertainty that characterized the trial.

Mrs. Williams alleged that similar incidents known to both the owner and the operator should have put them on notice that the building had been selected by criminals as an habitual place for sexual assaults. Evidence at the trial showed that in July 1956 a man with a knife attempted an attack on a young woman using the stairs between the second floor and third floor. Mr. Songy, the Assistant Building Manager, was aware of this occurrence. Some months after that incident, a man was found in the ladies' dressing room. This was reported to the management. Mr. Songy testified that he knew of two other assaults in the building which had occurred less than six months before the attack on Mrs. Williams; neither was reported to the police. Only about an hour before Mrs. Williams was attacked, a young man, masked with a handkerchief and carrying a knife, threatened a woman in the ladies' dressing room on the third floor. She fought him off, reported the incident to the elevator starter, and asked him to call the

---

trine in Louisiana, 17 Tul.L.Rev. 159 (1952). See also Pound, Introduction to the Philosophy of Law (1922) 144–190.

6. For example, Art. 1010 Cód.Civ. español; Art. 1529, Cód.Civ.Brazil; Art. 1933, Nuevo Codigo Civ.Mexico; Art. 1152–53, Bk. II, Tit. IX, Cód.Civ.Argentina; Art. 1910, Cód. d Cuba; Art. 2328, Cód. Chilenos.

7. For purposes of this opinion, it is unnecessary to distinguish between the owner and the building management company.

8. Article 2315, in pertinent part, reads: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." This is almost identical with Article 1382 of the French Civil Code.

police. Instead, he sealed the stairwell and made an unsuccessful search of the premises.[9] The police were not called until shortly after the attack on Mrs. Williams.

The Building Manager, Mr. Lynch, and his assistant, Mr. Songy, testified that they knew of these earlier incidents. Mr. Lynch said that he did not bring any of them to the attention of the police because his tenants had not asked him to do so. None of the tenants testified. Mr. Songy and Mr. Lynch testified that they considered their procedures adequate; some such incidents, they said, cannot be avoided in the operation of a large office building.

■ On this and other evidence the trial judge properly submitted the issue of negligence to the jury.

Counsel for Mrs. Williams asked the court to give specific instructions that the manager of an office building owes invitees the duties set forth in Article 177 of the Civil Code; that Article 177 requires the defendants to carry the burden of proving that they complied with the duty of superintending and policing the building. The trial judge refused to do so, and instructed the jury that the operators of a building, must use "reasonable and ordinary care to keep such building or premises in such a safe condition that the plaintiff here would not be unnecessarily exposed to danger." After deliberating for two hours, the jury returned for further instructions because, as the foreman said, "There seems to be some misunderstanding about your charge." The trial judge asked if this misunderstanding related to the question of negligence and the duty of the owner of a building. The foreman answered affirmatively. The court repeated the earlier charge, carefully defining "negligence', "ordinary care", "a reasonably prudent person", and "burden of proof". Then he asked if counsel had anything to add. Counsel for Mrs. Williams again urged the trial judge to give special instructions, particularly with regard to Article 177. The trial judge answered: "No, I don't think that article is applicable. * * * I think that it would simply tend to be confusing. In some respects if it were given it would be satisfactory but I think that I have covered those portions in my general charge."

II.

■ The plaintiff, concentrating on the last half of Article 177 to the disregard of the first half, reads Article 177 as a law of broad application covering all of the duties of the owner of a building arising out of the "master's" underlying duty of "the superintendence and police of his house." As the plaintiff construes it, the article makes the owner responsible for any faults traceable to lack of proper policing of the premises and the burden of proof is on the owner to prove no-negligence. This construction is erroneous. The article has nothing to do with negligence and the burden of proof. A study of the antecedents of Article 177 shows that the language, *"and [10] inasmuch as the master has the superintendence and police of his house, and is*

---

9. An elevator starter and an engineer had charge of the building on Saturdays, and were the only men "on guard" the day of the attack. Neither had authority to call police without permission of the Building Manager (who was out of town on the day in question) or the Assistant Building Manager (who was at his home in New Orleans).

10. Part of the confusion may come from the word "and." It has no counterpart in the French or English text of the article in the Code of 1808, or in the French text of the Code of 1825. Moreau-Lislet and Brown wrote the Code of 1808 in French. Others translated it into English, and it was printed with the French and English texts on opposite pages; in event of a conflict the French prevailed. The English translation is sometimes imperfect. See Dubuisson, Codes of Louisiana (Originals Written in French; Errors of Translation), 25 La.Bar Ass'n Rep. 143 (1924). Most of the chapter on Master and Servant was carried over into the Code of 1825 without change. "And" crept in, perhaps as a misguided effort to improve the translation or perhaps simply as a printer's error.

*responsible for the faults committed therein*", is simply an explanation of the vicarious liability absolutely imposed on the master as a matter of public policy in the specific fact situation involving damage caused by objects thrown out of a house. If Article 177 is properly construed, and if it were applicable here, the burden of proof would be unimportant and proof of no-negligence would not save the building owner. There is, of course, a duty on the householder or the owner of a building to furnish a safe place for invitees, but that duty arises under Articles 2315 and 2316 and in an action based on the breach of such duty the plaintiff carries the burden of proof as he would in an ordinary action based on negligence.

■ Before discussing the derivation of the law, we note that the position of the article in the Code gives some indication of its restricted coverage. It is found in "Chapter 2—Of Free Servants", in "Book I, Title VI—Of Master and Servants".[11] The pattern of the chapter and the logic of the codal arrangement suggest strongly that Article 177 was never intended to regulate broadly the duties of the owner of a building. The law arose out of a special situation characteristic of urban communities in which citizens on the streets were exposed to hazards associated with the absence of plumbing, dispose-alls, and garbage collectors. The master is not liable because of the conjunction of the general duty to superintend and to police his premises and the general duty arising from the doctrine of respondeat superior. He is liable simply because the thing thrown came from his house and presumably was thrown by one of his servants. It is noxal liability arising from the master's relation to the house and the servant (or sometimes a guest) connected with the house, as a result of which a person in the street suffers an injury; the application of the law is limited to these facts. The master cannot escape liability by showing no negligence on his part, that is, that the servants were not chosen carelessly, or that there was nothing he

11. The position of an article in a code is more important than the position of a provision in a statute, because a code is conceived of as a complete and systematic compilation of co-ordinated principles of law; a common law statute is not so considered and need not be systematic. Article 177 is one of thirteen articles on "free servants" having its codal origin in Louisiana in the Code of 1808, Book 1, Title VI, "Of the Master and Servant," ["Du Maitre et Du Serviteur"]. Chapter 1 of Title VI Book 1, specifies that there are two classes of servants in the "territory," free servants and slaves; Chapter 2 deals with free servants, Chapter 3 with slaves. The present Article 177 was originally Article 14 of Title VI, appearing in Chapter 2 on free servants ["serviteurs libres"]. These articles have remained basically intact, except that Art. 162 of the present Code now provides that "[T]here is only one class of servants in this State, to wit: Free servants," and the Chapter on Slaves is entirely excluded. Art. 163 defines free servants. Art. 164 specifies that there are three kinds of free servants. Art. 165 states that the manner and mode by which persons bind themselves to serve are prescribed by special laws [originally by "un acte spécial de la Législature de ce Territoire"]. Art. 166, stating when the engagement of minors shall expire, and Art. 167, regarding the binding of majors, and Art. 168, regarding engagements made in foreign countries, were not among the original thirteen articles in the Code of 1808. Art. 169 covers implied conditions in the contract of apprenticeship. Art. 170 establishes remedies (specific performance and rescission). Art 171 provides for the case of the master's ill-use of his servant or apprentice. Art. 172 provides for the death of the master, but this article too was not among the original thirteen. Art. 173 sets forth the permissible scope of the master's correction of the apprentice. Art. 174 creates a cause of action in favor of the master for damages caused to his servant by another. Art. 175 sets out the right of the master to defend his servant. Art. 176 sets out the liability of the master for his servant's offenses and quasi offenses. Then, at the end of this series of articles, Article 177 covers the particular situation of a master's liability for untidy or dangerous objects thrown out of the house into the street, presumably by servants.

could have done to prevent the injury; nor can he escape by showing his servants were not negligent. (His only relief, in Roman law or under the Louisiana Codes of 1808 and 1825, lay in noxal surrender, for example, forfeiture of the offending slave.) The general law covering the master's delictual liability for the acts of his servant is Article 2320. This article stands, properly enough, in "Chapter 2—Of Offenses and Quasi Offenses", of "Title V—of Quasi Contracts, and Of Offenses and Quasi Offenses", along with Article 2315 [12] covering wrongful acts, Article 2317 covering "acts of persons for whom we are answerable, or of things which we have in our custody," and other articles of a general nature.[13] Article 2320, which qualifies Article 2317, reads:

"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.

"Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.

"In the above cases, responsibility only attaches, when the masters or employers, teachers, and artisans, might have prevented the act which caused the damage, and have not done it."

The last paragraph of Article 2320, now virtually obsolete,[14] demonstrates that Article 177 was necessary in order to impose liability in cases where otherwise responsibility would attach "only * * * when the masters * * * might have prevented the act which caused the damage, and have not done it." Article 177 also eliminates the defense set out in the first paragraph of Article 2320, that the act was beyond the scope of employment.

The Louisiana history of Article 177 begins with one of its great jurists, L. Moreau-Lislet. Moreau-Lislet and James Brown compiled the Code of 1808, a digest in codal form of the existing laws in the Territory of Orleans (now the State of Louisiana). Moreau-Lislet, with Edward Livingston and Pierre Derbigny, also prepared the Code of 1825. In between working on these codes, Moreau-Lislet, assisted by Henry Carleton, was commissioned by the legislature to translate the portions of Las Siete Partidas having the force of law in Louisiana.[15]

Article 177 of Louisiana's present Revised Code of 1870 is identical with Article 171 of the Code of 1825 and with Article 14, Title VI of the Code of 1808. There is no corresponding article in the French Civil Code. A preliminary draft of the Code Napoleon, used by the Louisiana codifiers [16] as a source for the Code

12. See footnote 8.

13. See footnote 17.

14. See Nelson v. Crescent City Railroad, 1897, 49 La.Ann. 491, 21 So. 635; Ragas v. Douglas, 1916, 139 La. 773, 72 So. 242.

15. In the early days of Louisiana the Custom of Paris prevailed. France ceded Louisiana to Spain in 1762 but the laws of Spain were not introduced into Louisiana until 1769, when the Spanish Governor, Don Alejandro O'Reilly abolished French law by proclamation. The short-lived French regime in 1803 made no effort to restore French law. In 1817 the Supreme Court of Louisiana held that Spanish law was still in force, unaffected by the Code of 1808 except where expressly or impliedly changed. Cottin v. Cottin, 5 Mart. 93 (1817). This holding led to the Moreau-Lislet and Carleton translation of Las Siete Partidas and,

a little later, to the Code of 1825. See Batiza, The Influence of the Spanish Law in Louisiana, 33 Tul.L.Rev. 29 (1959); Jolowicz, The Civil Law in Louisiana, 29 Tul.L.Rev. 491 (1955); Tucker, Source Books of Louisiana Law: Spanish Laws 8 Tul.L.Rev. 82 (1933).

16. The Assembly in 1790, the Convention in 1793 and 1794, and the Directoire in 1796 all promised the French people a code; Cambacérès and his collaborators presented draft codes which failed of adoption. Finally, in 1800, Napoleon, as First Consul, appointed and led the commissions that drew up the Projet du Gouvernement that became the Code Civil des Fransais, promulgated in 1804. The number of instances in which the Louisiana compilers chose sections of the Projet du Gouvernement rather than the Code as promulgated suggests that either a copy of the Code was not available,

of 1808, did attempt to codify the law relating to things thrown from houses.[17] The Counseil d'État rejected the proposed provisions. The Code Napoleon, a code to reform the law, perhaps influenced by contemporary philosophical interest in individualism, free will, and moral responsibility, takes the approach that the liability of a master for things thrown out of a house must be based on culpability within the general principle of no liability without fault.[18] Such lia-

which seems highly unlikely, or that they preferred the preliminary draft. It is probable, but it has never been proved that the earlier drafts prepared principally under Cambacérès were available in Louisiana.

17. Articles 16 and 17 of the Projet du Gouvernement, Book III, Title III, read as follows:

"XVI. Si d'une maison habitée par plusieurs personnes, il est jeté sur un passant de l'eau ou quelque chose qui cause un dommage, ceux qui habitent l'appartement d'où on l'a jetée, sont tous solidairement responsabiles, à moins que celui qui a jeté ne soit connu, auquel cas il doit seul la réparation du dommage."

"16. If water or anything which causes damage is thrown from a house inhabited by several persons, those who live in the apartment from which it was thrown are all solidarily responsible, unless the person who threw it is known, in which case he alone is responsible for the reparation of the damage." (Our translation)

"XVII. Les hôtes qui n'habitent qu'en passant dans la maison d'où chose a été jetée, ne sont point tenus du dommage, à moins qu'il ne soit prouvé que ce sont eux qui ont jeté; mais celui qui les loge en est tenu."

"17. Transient guests in the house from which the thing was thrown, are not held for the damage, unless it be proven that it was they who threw the thing; but he who lodges them is held for it." (Our translation)

In the counseil d'État, M. Miot objected to the proposed Articles 16 and 17, saying that the enunciation of the general principle sufficed [Article 15, later 1382, that every act of man which causes damage to another obligates him by whose fault the injury occurred to repair it ("le réparer"), and that the examples should be withdrawn ["retrachées"]. After this observation, the Counseil d'État deleted Articles 16 and 17. 13 Feret, Recueil Complet des Traveaux Préparatoiries du Code Civil (1827) 455; Jonanneau et Solon, Discussions du Code Napoleon dan Le Counseil d'État, art. 1382, p. 351–52 (footnote). For an analysis of the reasons for Article 1382 see 13 Fenet, Recueil Complet des Traveaux Préparatoires du Code Civil (1827) 464, 467–8, 474–76, 487–90.

It was in this same section, C.N. Article 1384(3) [Article 19, Projet du Gouvernement] that the rule was expressed that masters and employers are responsible for damage caused by their servants and employees in the functions for which they were employed [in modern language, "in the scope of their employment"]. C.N. 1384(3) was taken verbatim into the 1808 Code and is presently Article 2320 of the 1870 Code. Similarly, C.N. 1382 [Art. 15, Projet] was adopted in the Code of 1808, p. 320, Art. 16, and is now Article 2315, La.Civ.Co. of 1870. C.N. 1383 [Art. 18, Projet] was adopted in the Code of 1808, p. 320, Art. 19, and is now Article 2316. C.N. 1384(1) [Art. 19, Projet] was adopted in the Code of 1908, p. 320. Art. 20(1), and is now Article 2317. C.N. 1384(2) (Art. 19, Projet) was adopted in the Code of 1808, p. 320, Art. 20(2), and is now Article 2318. C.N. 1384 (3–5) [Art. 20(3–5), Projet], were adopted in the Code of 1808, p. 320, Art. 20(3–6), and are now (with some changes) Article 2320. C.N. 1385 [Art. 20(6), Projet] was adopted in the Code of 1808, p. 320, Art. 20(7), and is now Article 2321. C.N. 1386 (Art. 21, Projet), was adopted in the Code of 1808, p. 322, Art. 22, and is now Article 2322.

Thus, the present Louisiana codal section on Offenses and Quasi-Offenses is substantially the same as the French section on "Delits et Quasi-Delits", the only differences being that two articles were added (Articles 2319 and 2323) and Article 2315, the basis of Louisiana's tort doctrine, has been frequently amended.

18. Pound and others suggest that the classic formulation of liability based on fault, Article 1382 of the French Civil Code (Article 2315 of the Louisiana Civil Code), was the result of late eighteenth century and early nineteenth century philosophical interest in free will and individualism as opposed to laws based on "enforcement of reasonable expectations arising out of conduct, relations and situations." Pound, Philosophy of Law (1922) 155–163, 186–190. See also Pound, Jurisprudence (1959) p. 445;

bility of a master, of course, would be subject to the usual defenses available to defendants in negligence actions and not subject to the burden of proving no-negligence. There are several possible explanations for the drafters' of the Code of 1825 rejecting the Code Napoleon approach and deliberately choosing the limited in scope but strict liability approach of Roman law to actions for damages caused by things thrown from houses: the lesser exposure of Louisiana than France to European philosophy, the difference between Paris streets and New Orleans streets, or, perhaps, the influence of Louis Moreau-Lislet, who was steeped in Roman law, Spanish law, and the precodal French commentaries. The Code of 1825 was a true Code and, like the Code Napoleon, a reform code; the so-called "Code" of 1808, however, was intended as a *digest of existing laws* in the Territory of Orleans,[19] clarifying and

systematizing but not remaking the law. There is no doubt that in 1808 Moreau-Lislet regarded absolute liability. as the existing law of Louisiana for things thrown out of a house.

The principal sources of the Louisiana Code are well known. Oversimplifying it, the codal roots extend, *on the French side,* through the Code Napoleon, the Code Louis, the Ordinances of D'Aquesseau, the treatises of Pothier and Domat to Justinian; *on the Spanish side,* through the Fuero Juzgo, the Fuero Real, the Récopilaciones de Leyes de los Reynos de las Indias, the Nueva Récopilacion, and Las Siete Partidas to Justinian.[20]

In drafting Article 14, Title VI of the 1808 Code, Moreau-Lislet notched trees so that his trail could be easily followed. In a treasured copy of the Code of 1808, which he annotated on interleaves, there is a notation opposite Article 14, Title VI, reading, "Bk. 1, Tit. 6, L. 25. T. 15. part

Duguit, General Changes in Private Law Since the Code Napoleon, in Cohen and Cohen, "Readings in Jurisprudence and Philosophy, 262–65 (1951).

19. The arrangement of laws is codal and it was universally referred to in its day, and now, as a "code". Its compilers over-relied on French law and took other liberties with the authority given them by the legislature, but there is no doubt that they were held down by the legislature's direction to prepare a digest of existing laws. See e. g., Stone, The Civil Code of 1808 for the Territory of Orleans, 33 Tul.L.Rev. 1 (1958); Hood, The History and Development of the Louisiana Civil Code, 33 Tul.L.Rev. 7 (1958); Baudouin, The Influence of the Code Napoleon, 33 Tul.L.Rev. 21 (1958); Franklin, An Important Document in the History of American Roman and Civil Law: the De La Vergne Manuscript, 33 Tul.L.Rev. 35 (1958).

20. There are a large number of writings on the sources of Louisiana law. See especially Tucker, Source Books of Louisiana Law: I The Civil Code, 6 Tul. L.Rev. 280 (1932); II The Code of Practice, 7 Tul.L.Rev. 396 (1933); III Spanish Laws, 8 Tul.L.Rev. 396 (1934); Constitution, Statutes, Reports, and Digests, 9 Tul.L.Rev. 244 (1935). Tucker, The Code in Louisiana, in The Code Napoleon and the Common Law World (Ed. by

Schwartz, 1956) 346. For older material, see Moreau-Lislet and Carleton, Preface to their translation of Las Siete Partidas (1820); Schmidt, History of the Jurisprudence of Louisiana, 1 Louisiana L. Journ. 1 (1841); Schmidt, The Civil Law of Spain and Mexico (1851); Semmes, The Civil Law as Transplanted in Louisiana, Proc. of Amer.Bar Ass'n (1883); Fenner, Genesis and Descent of the System of Law Prevailing in Louisiana (1887); Wigmore, Louisiana, The Story of Its Jurisprudence, 1 Sou.L.Quart. (1916), 22 Amer.L.Rev. 890 (1888); Howe, Roman and Civil Law in America, 16 Harv.L.Rev. 342, Dart, The Sources of the Civil Code, 13 La.Bar Ass'n Rep. 21 (1911); Dart, The Louisiana Judicial System, A Study of the Historical Sources, Introduction to Dart's Louisiana Digest (1917); Dart, the Legal Institutions of Louisiana, 3 Sou.L.Quart. 247 (1918); Dart, Influence of the Ancient Laws of Spain on the Jurisprudence of Louisiana, 6 Tul.L.Rev. 83 (1931). For more recent writings, see, Surveyor, The Civil Law in Quebec and in Louisiana, 1 La.L.Rev. 649 (1939); Hood, The History and Development of the Louisiana Civil Code, 33 Tul.L.Rev. 7 (1958), 19 La.L.Rev. 18 (1958); Batiza, The Influence of Spanish Law in Louisiana, 33 Tul.L.Rev. 29 (1958); Baudoin, The Influence of the Code Napoleon, 33 Tul. L.Rev. 21 (1958).

7." [21] This is a reference to Title 15, Law 25 of the 7th Partida of the Moreau-Lislet and Carleton translation of "Las Siete Partidas". Title 15, Law 25 of the 7th Partidas is as follows:

"That they who throw bones, or filth into the streets, shall pay for the damage which they cause to persons passing there.

"Men sometimes throw water, bones, or other like things out of the houses in which they live, into the streets, and although they should not do it with the intention of injuring any one, yet if they do damage to the clothes or garments of others, they who dwell in the house, will be bound to pay double the amount of such damage. And if many persons should live in the house from which the substance was thrown, whether it belonged to them or had been hired or borrowed by them, they will be jointly bound to pay for the damage, if it should not be known with certainty who had caused it. But if it should be known who he was, then he alone will be responsible for the damage, and not the others. But if among those who dwell habitually (cotidianamente) in the house, there should be some persons received as guests, these will not be bound to contribute in any manner to the damage caused in this way, unless they were the authors of it." 2 Las Siete Partidas (Moreau and Charleton Translation, 1820), p. 1213.

In his preface to Title 15 of the 7th Partida Moreau-Lislet specifically cites Justinian ("Digest, lib. 9, tit. 3. * * * De his qui effuderint vel dejecerint") and Domat ("Domat's Civil Law, part 1, b. 2, tit. 8") as sources for this section of his Las Siete Partidas.

We go then to these two sources. Book 9, Title 3, of the Digest of Justinian concerns "Those Who Pour Anything Out

---

21. The Court has examined this copy which is in the possession of the De la Vergne family in New Orleans. The handwriting has never been verified as Moreau-Lislet's handwriting and may be that of an amanuensis, but there is strong internal evidence that he wrote the preface and there is no doubt that he was responsible for the annotations. The De la Vergne family has preserved it from one generation to another as Moreau-Lislet's own copy.

"The de la Vargne manuscript has the name of 'L. Moreau Lislet' engraved in gold on the beautiful leather binding. This writer is not at all qualified to consider whether the handwriting of the manuscript is that of Moreau-Lislet. This would not necessarily decide whether he was or was not the author. However, the amazing erudition shown in collecting ancient and medieval sources of law and of stating their relation to the Louisiana Digest of 1808 limits the persons who might have prepared the manuscript to the very small group of intellectuals to which Moreau-Lislet belonged. ¶ "There is marked similarity between the content of the preface of the de la Vergne manuscript and the translators' preface which Moreau-Lislet and Henry Carleton attached to their famous two volume translation of the Partidas published in 1820. Indeed, the content of the preface of the de la Vergne manuscript of 1814 gives the impression of being a summary or early draught of the introduction published in 1820. In the text of 1820 appears even more clearly the thought that the Partidas 'may be advantageously compared with any code published in the most enlightened ages of the world,' thus again denigrating the importance of the French Code as an accomplishment of the French Enlightenment. However, by 1823, Moreau-Lislet, Livingston and Derbigny, in their report relating to the progress of their projet of what became in due course the Louisiana Civil Code of 1825, informed the Louisiana Legislature that the Louisiana Digest of 1808 * * * in the several points of jurisprudence, which are contained in its provisions * * * took away on those subjects, the necessity of a reference to the Spanish and Roman authorities * * *' and that the French Civil Code of 1804 was ' * * * a system approaching nearer to perfection than any which preceded it.'" Franklin, An Important Document in the History of American Roman and Civil Law. The de la Vergne Manuscript, 33 Tul.L.Rev. 35, 38 (1958). See also Dainow, Moreau-Lislet's Notes on Sources of Louisiana Civil Code of 1808, 19 La.L.Rev. 43 (1958).

or Throw Anything Down."[22] The Praetor grants a cause of action: "Where anything is thrown down or poured out from anywhere upon a place where persons are in the habit of passing or standing, I will grant an action against the party who lives there for twofold the amount of damage occasioned or done." Ulpian says that this praetorian edict is "of the greatest advantage, as it is for the public welfare that persons should come and go over the roads without fear or danger." d.9.3(1). "This action *in factum* is granted against the party who lodged in the house at the time when something was thrown down or poured out, and not against the owner of the house, because the blame attaches to the former. Mention of negligence or that the defendant denies the fact is not made, in order to authorize an action for double damages, although both of these matters are stated to afford good ground for an action for wrongful damage." D.9.3.1. (4). There is an elaborate discussion on the nature and implications of this edict.

Jean Domat, who exercised an enormous influence on French law and on Louisiana law,[23] refers to this same section of the Digest [24] in the section of his own famous treatise devoted to "That which is thrown out of a house, or which may fall down from it, and do some damage." 1 Domat, The Civil Law in Its Natural Order (Strahan trans., Cushing's Ed.1853) Nos. 1547-57. He, too, discusses at length the ramifications of damages caused by things being thrown out of a house. Domat says: "He who inhabits a house, whether he be proprietor of it, tenant, or other, is liable for the damage which is caused by any thing thrown out or poured out of any place of the said house, whether by day or by night. And he ought to answer for it to him who shall have suffered the damage,

whether it was he himself that threw it out, or any of his family or domestics, even although it were in his absence, or without his knowledge." Id. No. 1547. "If several persons inhabit the same place from whence any thing hath been thrown or poured out, every one of them will be answerable for the whole damage; unless it can be known which of the masters, or of the persons for whom each master is answerable, has caused it. But if their habitation be distinct, every one is only answerable for what shall be thrown out of the places which he occupies." Id. No. 1551.

Article 14, Title VI, of the 1808 Code and its successor, Article 177 of the 1825 Code, follow the Digest and Domat in making the master absolutely liable on pure policy reasons in a particular fact situation in which the state has an interest; they differ from these sources in not dealing with multiple occupancy. There is no suggestion in these sources or in the literature on the subject that liability is based on culpability, on general delictual responsibility, on the doctrine of respondeat superior, or on the close-to-strict liability imposed on a master in early times for the acts of a servant. And there is nothing in the sources extending such liability to injuries taking place *within* a building.

The explanatory language, made much of by appellant, "and inasmuch as the master has the superintendence and police of his house, and is responsible for the faults committed therein", does not appear in either of the two principal sources or in the civilian sources we have examined. Blackstone, however, in discussing "how strangers may be affected by his relation of master and servant" does say: "A master is, lastly, chargeable if any of his family layeth or casteth anything out of his house into the street or common

22. 3 Scott, The Civil Law, The Digests or Pandects, Book IX, Title III.

23. "Domat undertook the task of reducing to order the civil laws of his country, so far at least as they were identical with, or founded in, those of the Roman

Code." Domat, The Civil Law in Its Natural Order (Strahan trans., Cushing Ed.1861) n. 13 at p. 111.

24. Domat cites "L.I.D. de his qui effud; vel. dejec; — 1. 6 § 2, eod; — 1. 6, § 1."

highway, to the damage of any individual, or the common nuisance of his majesty's liege people: for the master hath the superintendence and charge of all his household. And this also agrees with the civil law; which holds that the *pater familias*, in this and similar cases, *'ob alterius culbam tenetur, sive servi, sive liberi!* " [25] Blackstone's Commentaries were in Moreau-Lislet's library.[26]

Article 18 of the Code directs courts to construe laws by "considering the meaning and spirit of the law".[27] As is evident from its history, the reason and spirit of Article 177 show that the article is applicable only when an injury results from an object "thrown out" of a house or building.

We turn now from jurists to jurisprudence.

### III.

In civilian jurisdictions new wine in old bottles is not a deceitful trick. It is inherent in the evolutive construction that is essential to making a code live and work. But Article 177 has seldom been cited; it has never been applied, irrespective of negligence, to an action by one injured within a building; and it has never been used to shift the burden of proof to a defendant. We find only one case decided squarely under Article 177. The cases appellant cites are clearly distinguishable.

In Simmonds v. Southern Rifle Club, 1900, 52 La.Ann. 1114, 27 So. 656, 657, a rifle club was held liable for injuries to a little girl struck by a bullet fired from the club's premises by one of its members or a guest. Club members and their guests were firing in the direction of a parapet which, had it been perfectly sound, would have stopped all the bullets. But the parapet had many bullet holes in it, and the wood had rotted. The child was playing in her father's yard, directly in the line of firing, about a hundred feet on the other side of the parapet. At the time of the accident there was no other shooting going on in the neighborhood except at the rifle club. The Supreme Court, in a short opinion, said: "It is not beyond the range of possibility that [the bullet] may have struck the parapet at a point where it had been already partially perforated by one or more bullets, and where the wood had become rotten by reason of the letting of the rain and air into the hole thus made. We, therefore, think that the club should be held liable for the injury sustained. Civ.Code, arts. 177, 2315, 2317." The fact situation does not fit exactly into the fact situation covered by Article 177, (the injury did not occur on a street or public road, for example) but the parallel between an object thrown from a house and a bullet propelled from a gun seems close enough to justify application of the article and is in keeping with the civilian concept of the regle juridique. The important fact distinguishing Simmonds from other cases the appellant cites is that the injured girl was *outside* of the owner's property. The court referred to Articles 2315 and 2317, but the decision does not suggest negligence; it rests, it seems to us, on absolute liability under Article 177.

25. 1 Tucker's Blackstone P. 431 (1803).

26. Franklin, The Libraries of Edward Livingston and Moreau-Lislet, 15 Tul.L.Rev. 401 (1941).

27. "L'office de la loi est de fixer, par de grandes vues, les maximes générales du droit; d'établir des principes féconds en conséquences, et non de descendre dans le détail des questions qui peuvent naitre sur chaque matière, C'est au magistrate et au jurisconsulte, pénétrés de l'esprit général des lois, à *en diriger l'application.* * * * Il y a une science pours les législateurs, comme il y en a une pour les magistrats; et l'une ne ressemble pas à l'autre. La science du législateur consiste à trouver dans chaque matière, les principes les plus favorables au droit commun: *la science du magistrat est de mettre ces principes en action, de les ramifier, de les étendre par une application sage et raisonnée aux hypothèses privées.*" Portalis, Discours Préliminaire, reproduced in Fenet, Recueil complet des travaux préparatoiries du Code Civil, Vol. 1, 470, 475.

The cases appellant relies on in support of the high standard of care imposed on a building owner to superintend and police his property concern restaurant owners and innkeepers. Thus, in Miller v. De Rusa, 1955, La.App., 77 So.2d 748, 749, a guest sued both the owner of a barroom-grocery store and an assailant who struck him over the head with a club while the plaintiff was seated at the bar. The Court did not refer to Article 177, but relied on the general rule, citing authorities, that "the innkeeper must protect his guests". Similarly, in Matranga v. Travelers Ins. Co., 1951, La.App., 55 So.2d 633, 636, the court affirmed the award of damages to a patron of a restaurant injured in a fracas between the owner and his brother. The court held that "it is the duty of every storekeeper and restaurant operator to use reasonable care in the protection of his patrons and guests".

In De Hart v. Travelers Ins. Co., 1952, La.App., 10 So.2d 597, 598 the court did cite Article 177. The plaintiff was injured in a Bourbon Street brawl in a cafe-bar when another patron, intoxicated, broke a drinking glass on the counter of the bar at which the plaintiff was seated, and slashed the plaintiff's face with the fragments. The Court of Appeals, reversing and remanding the case, stated that "the proprietor of any public house of entertainment, as a result of an implied contract, though not an insurer of the safety of his guests, owes the duty to exercise reasonable care to protect them". The Court quoted the rule of law governing innkeepers as stated in Ruling Case Law, pointing out that the duty to protect patrons "is not absolute but is limited to the exercise of reasonable care, and the proprietor is liable only when he is negligent." "Such guests or patrons", said the court, "have the corresponding right to believe that the operator, personally, or by his delegated representative, is exercising such degree of reasonable care as shall tend to safety and orderliness. This rule accords with the principles of our Civil Code, which hold the master responsible for the proper policing of his own premises, and the faults committed therein. R.C.C. Art. 177." Id. at 599. It is evident that the court did not impose absolute liability under Article 177; the citation of the article was a genuflexion to the civil law.

In Finney v. Banner Cleaners & Dyers, 1930, 13 La.App. 101, 126 So. 573, 574, the plaintiff brought suit against the owner of a building to recover damages for injuries he sustained when one of the owner's employees suddenly and violently opened a heavy door which struck the plaintiff and knocked him in front of an approaching truck. The court held the owner liable: "The defendant's employee knew that workmen were engaged in the repair and remodeling of the building and were frequently using the alley * * *. Defendant's employee was therefore at fault in opening the doors suddenly with force and without warning when he was unable to see if there was any one passing or standing in front of the doors at the time. He failed to use such care and precaution as an ordinary prudent person should have exercised under the circumstances. Civ.Code, art. 2315; Civ.Code art. 177; 45 C.J. 861." As in De Hart v. Travelers, although the court cited Article 177, the test required "such care and precaution as an ordinary prudent person should have exercised under the circumstances".

In Thompson v. Commercial National Bank, 1924, 156 La. 479, 100 So. 688, Article 177 was correctly construed and narrowly limited to situations where an object is thrown from a house directly causing injury. In Thompson the plaintiff was struck on the head by a piece of the metal framework of an awning which fell from a window of one of the rooms occupied by an oil company in a bank's office building. The part fell from the awning to the sidewalk and struck the plaintiff after the canvas and ropes of the awning had been consumed by fire. The plaintiff brought suit against both the oil company and the bank, alleging that they jointly installed the framework and negligently failed to affix it securely to the

**582**

building and maintain it in a safe condition. The oil company contended that the bank was solely liable under Article 177, since the bank, as master, had the superintendence and police of its building and was responsible for the faults committed therein. The court dismissed this argument, saying: "This is, undoubtedly, a correct principle of law, where the thing thrown out of the master's house is the causa causans of the injury received by a passerby, or third person. Plaintiff's cause of action, however, is predicated squarely upon the legal proposition that, having erected the awning in question conjointly with the owner of the building, the lessee is bound in solido with the owner, and as a joint tort-feasor, for the injury resulting to plaintiff from defects in the original construction and failure to keep said awning in safe repair. In the present case, moreover, we do not find from the evidence that the ignition of the awning and ropes by some unknown third person was the proximate cause of the falling of the framework of the awning." 156 La., at 482, 100 So., at 689.

In view of the restricted scope of Article 177 and in the light of Louisiana jurisprudence, the trial judge correctly refused to charge the jury with regard to the effect of Article 177; he correctly charged that the owner of an office building owes a duty to provide a reasonably safe place for invitees and is liable only when the defendant successfully carries the burden of proving the defendant's negligence. Walsh v. Whitney, National Bank, 1941, La.App., 4 So.2d 553; De Latour v. Roosevelt Hotel, 1941, La.App., 1 So.2d 353; Ransom v. Kreeger Store, 1935, La.App., 158 So. 600; Indemnity Ins. Co. of North America v. Hinkle, 5 Cir., 1942, 127 F.2d 655.

The Court has considered all of the appellant's specifications of error, whether or not discussed in this opinion. There being no harmful error in the proceedings below, the decision is

Affirmed.