67 So.2d 737 (1953)
GAIDA
v.
HOURGETTES.
No. 19915.
Court of Appeal of Louisiana, Orleans.
November 2, 1953.
*738 Jacob H. Morrison and Nat. B. Knight, New Orleans, for plaintiff and appellant.
Louis H. Marrero III, Marrero, for defendant and appellee.
McBRIDE, Judge.
In the month of December, 1947, Mrs. Guiseppa Trompetto, wife of Lynn C. Orgeron, verbally leased the furnished premises 514 Second Street, Gretna, Jefferson Parish, from the defendant, who was the owner thereof in her own paraphernal right. At that time Lynn C. Orgeron was away on duty as a career member of the United States Navy. The leased premises consisted of one side of the typical onestory double "shotgun" house; that is to say, the building was divided into two dwelling compartments covered by the same roof, both sides or units being exact counterparts *739 except in one salient detail. Upon entering the house from a small front porch, the first room is a living room; then moving towards the rear the next room is a small hall with a bathroom beside it; then came the bedroom, and lastly, the kitchen. Heating facilities furnished by the lessor consisted of two open gas heaters characterized as "space heaters," the larger of which was located in the first room, and the other, of very small size, was located in the bathroom. The kitchen was equipped with a storage-type water heater of twenty-gallon capacity with a Bunsen burner. It is conceded that the water heater had been installed by the defendant-landlord in 1940 without a vent to the outside, which fact was unknown to any of the plaintiffs. The weight of the testimony of experts who appeared at the trial is that a vent or flue to a water heater of such type is necessary to carry off into the outside atmosphere noxious fumes caused by the gas consumed by the heater, which fumes could be dangerous to life if permitted to escape into the dwelling house. Even Crawford, defendant's expert, admitted that he would have required that the water heater be vented to the outside as provided by the National Board of Fire Underwriters in Pamphlet 54, and that it has been the recognized custom for at least ten years to vent water heaters in such a fashion. While the water heater in the house occupied by the Orgeron family was unvented, there is no dispute that the water heater of the same type located in the other half of the house occupied by Mr. and Mrs. Tierney, who are likewise tenants of the defendant, was properly and adequately vented to the outside.
During the absence of Lynn C. Orgeron with the United States Navy the premises 514 Second Street were occupied by his wife, their two-year-old child, and Mrs. Orgeron's half-sister, Lida Gaida, who subsequently became the wife of Andrew Schaubhut. A few days before the events hereinafter discussed Lynn C. Orgeron returned to Gretna on leave and occupied the house along with his wife, child, and sister-in-law. On the evening of January 18, 1948, these four occupants of the house, together with four other persons, were asphyxiated while congregated in the premises.
Seven damage suits resulted from the mass asphyxiation, all directed against the defendant as lessor, which were consolidated for trial and the evidence adduced was made applicable to all. The trial resulted in a separate judgment in each case dismissing the demands of the plaintiffs, all of whom have perfected appeals. The appeal of Mrs. Lida Gaida Schaubhut was the first of the seven docketed in this court.
The essence of plaintiffs' cases is that the water heater, which had been improperly installed and maintained by the lessor without vent or flue to the outside, of which circumstance the lessee, his family, and guests had no notice or knowledge, was the cause of the damages inflicted upon plaintiffs in that the noxious fumes emitted from the combustion of gases burned in the hot water heater could not escape from the dwelling unit. They seek to compress their claims within the doctrine of a landlord's liability to his tenant and persons lawfully on the premises, as enunciated by Klein v. Young, 163 La. 59, 111 So. 495, and as provided by LSA-C.C. arts. 2322, 2693 and 2695, for their damages by reason of vices and defects in the leased premises which the lessor should have foreseen and guarded against.
The defense to the suits revolves around several propositions: (a) That the sole cause of the injuries to plaintiffs was due to the fact that they "sealed tight" the house and denied themselves access to outside air, and that therefore their asphyxiations were no more than could have been expected under the circumstances; (b) that the two space heaters, and not the water heater, were the offending agents; (c) that an abnormal amount of heating equipment was used which consumed all of the oxygen in the house and caused carbon monoxide fumes to permeate the premises; (d) that when the hot water heater was installed in 1940 neither the building nor the *740 plumbing code of the City of Gretna specifically required that the water heater be vented to the outside; and (e) that the tenants allowed the faucets to run to prevent the pipes from bursting, which contributed to or was an independent cause of the asphyxiations.
Sunday, January 18, 1948, was extremely cold for this vicinity, and the thermometer hovered somewhere between 25° and 30° F. A cold water pipe beneath the house had burst, and upon the refusal of Mrs. Charles, the defendant, to repair it, Lynn C. Orgeron and Andrew Schaubhut repaired the broken pipe themselves and finished their work between 10:00 and 11:00 in the morning. Needless to say the Orgeron family continuously kept in full operation the two space heaters above alluded to, and while most of the witnesses for plaintiff testified that the doors and windows were kept closed, there is uncontradicted testimony to the effect that one of the windows was kept slightly open. Lynn C. Orgeron and his wife, after having experienced the vexations caused by the broken pipe, opened slightly all water faucets in the house, including those connected with the water heater, so that water could trickle through and prevent the water line from freezing and bursting the pipes. While Mr. and Mrs. Orgeron and their next-door neighbor, Mrs. Tierney, the latter also being one of the plaintiffs, testified that Mrs. Charles authorized and advised them to open the faucets, the defendant denies their statements.
At this point it might be well to relate the movements of the persons involved in the unfortunate occurrence. There are some unimportant discrepancies as to the time element, which need not be discussed or considered. Substantially the testimony shows that before noon Lynn C. Orgeron, his wife, and Lida Gaida left the premises and attended church. In the afternoon Andrew Schaubhut, who had departed in the morning after repairing the broken pipe, returned and he, together with his fiancee, Miss Gaida, left to attend a moving picture show. About this time Mrs. Lynn C. Orgeron prepared supper, and then Eugene C. Orgeron and his wife, the parents of Lynn C. Orgeron, "stopped by" and after remaining for about thirty minutes left to play Keno at an establishment in the neighborhood. Mr. and Mrs. Aby Barrios, the latter a sister of Lynn C. Orgeron, called at about 5:30 p. m., and after visiting briefly, left also to go to the moving picture show.
About 8:00 p. m. the two-year-old child of Mr. and Mrs. Lynn C. Orgeron showed symptoms of sickness in the kitchen by becoming nauseated and intermittently unconscious, and about 8:30 p. m. Mrs. Lynn C. Orgeron also became ill. Around 9:30 p. m. Lida Gaida and Andrew Schaubhut, in company with Mr. and Mrs. Aby Barrios, returned. Schaubhut and Miss Gaida remained in the house, but Mr. and Mrs. Barrios departed for their home. At approximately 9:45 p. m. a telephone call was made to Dr. Floyd Hindelang by Mrs. Lynn C. Orgeron. Plaintiffs' versions are that before the doctor arrived Lynn C. Orgeron, Lida Gaida, and Andrew Schaubhut also had become ill, and the latter then called to Mrs. Tierney next door, and she, pursuant to Schaubhut's summons, came over at approximately 10:30 p. m. and became ill shortly thereafter. About this time Mrs. Barrios was called from her home, and she also experienced illness after entering the premises. It seems as though news of the asphyxiations had gotten about, and Mrs. Edna C. Orgeron, the wife of Eugene C. Orgeron, received word in the Keno Parlor to come to the premises where she arrived at about 10:45 p. m.
The time of the arrival of Dr. Hindelang at the scene is somewhat uncertain, but when he reached the premises, according to his testimony, he found that Mrs. Lynn C. Orgeron and her child had fainted, but that all of the other persons in the house were "all right." He states that during the course of his administrations to Mrs. Orgeron and the child, the others became sick and suffered dizziness, weakness, severe pains in the head, and some were nauseated. Dr. Hindelang himself became affected and walked into the kitchen where he discerned a peculiar odor and noticed *741 that the unvented water heater was in full operation. He thereupon turned off the gas and threw open all doors and windows in the house, whereupon everyone seemed to recover except Mrs. Eugene C. Orgeron, who was found to be dead. Dr. Hindelang's diagnosis was that the stricken persons suffered from carbon monoxide gas poisoning. He explained that carbon monoxide displaces the oxygen in the air, and that when a person inhales the poisonous gas his blood stream is denied oxygen, which could be fatal to the victim.
We are convinced that the carbon monoxide which affected those in the home on that Sunday evening was emitted by and escaped from the unvented water heater in the kitchen of the premises. Mrs. Tierney, the next-door neighbor, testified that on the day in question her home had remained tightly closed with the two space heaters in full operation, and that from time to time she drew water from the water heater, but that neither she nor her husband experienced any discomfort or sickness whatsoever. James E. Leddy, a graduate engineer of the Naval Engineering School in Norfolk, Virginia, with nearly forty years of experience, and who holds the position of Chief Mechanical Inspector in the Division of Regulatory Inspections of the City of New Orleans, testified on behalf of plaintiffs that an unvented water heater would emit carbon dioxide, and if there was a laxity of oxygen, the combustion of the gas would be unbalanced and the heater would generate carbon monoxide, which is a toxic gas not detectable by an inexperienced person. From this expert's testimony it appears that a vent or flue connected with the water heater and running to the outside not only serves the purpose of carrying off the noxious fumes, but serves the purpose of drawing in a proper amount of oxygen for combustion. We do not think that the asphyxiations of the persons within the premises could possibly have been caused by either of the moderate-sized space heaters or by a combination of both. As Mr. Leddy pointed out, space heaters such as those in the house consume oxygen but not to the same extent as the water heater. He stated that he knows from his experience that if a small room in which a space heater was in operation were to be sealed tight, it might cause a person therein to smother within five or six hours, but that with persons coming in and out through doors in the building there would be admitted from the outside a sufficient amount of oxygen to support normal combustion. He further explained that even if a window in a room wherein was located an unvented water heater was partly open, there would be danger of asphyxiation from carbon monoxide, as proper combustion could not be properly supported with a window half open, for the reason that the incoming air would have a tendency to rise towards the ceiling, the warmest place in the room.
We might say in passing that even if it could be said the injuries sustained by the persons in the Orgeron home had been caused by carbon monoxide generated by the space heaters, the defendant would find herself on the horns of a dilemma, for the simple and obvious reason that the space heaters were furnished by her as part of the leased premises.
The defense that the occupants of the house sealed themselves in and denied themselves access to outside oxygen is untenable. Everyone knows that one or two freezes occur during the average winter in the vicinity of New Orleans and that it is not unusual for persons, especially those in a small house such as was occupied by the Orgerons, to keep the doors and windows closed during the cold spells. There seems to be nothing anomalous about the facts in the case which show the Orgerons kept the doors and windows closed to the outside cold, and certainly it cannot be said that there was an inordinate amount of heating equipment in the premises. To the contrary, the testimony is almost uniform that, if anything, the premises were not warm enough and were, in fact, rather chilly, except in the immediate areas of the two small gas heaters. The facts shown by the record indisputably set aside the argument of defendant that the Orgerons sealed themselves in the house and cut off *742 any possibility of oxygen from the outside making entry. A window in the front room was partly open, and it seems to us that this fact taken in conjunction with the entry and exit of the persons involved throughout the afternoon and evening of the day in question was sufficient to permit a sufficient amount of oxygen to enter the premises.
The defense that neither the building nor the plumbing codes of the City of Gretna prevailing in 1940 specifically required that the water heater be vented to the outside is likewise without merit. In addition to the expert testimony, common sense and common knowledge dictate to us that a gas operated water heater with Bunsen burner should be properly vented even in the absence of a local ordinance or law not specifically providing that such a heater must be equipped with a vent. Our Supreme Court in Jones v. Blossman, 209 La. 530, 25 So.2d 85, accepted Pamphlet No. 54 of the National Board of Fire Underwriters as authority for the correct method of installing a gas operated water heater. This same pamphlet of the National Board of Fire Underwriters is relied upon by plaintiffs and it figures prominently throughout the testimony of Mr. Leddy, the Chief Mechanical Inspector of the Division of Regulatory Inspections of the City of New Orleans. Mr. Leddy cited the aforesaid pamphlet, which was adopted about thirty years ago, as the proper standard for installing heating devices, and pointed out that those standard regulations are of general application throughout the United States. It seems to us, therefore, that the defendant was under the duty of complying with the usual and universally accepted rules and safety regulations when installing the water heater in the premises leased to the Orgerons.
Counsel for defendant strenuously argues that the tenants misused the water heater by opening the faucets controlling the flow of hot water, which, he says, contributed to or was an independent cause of the asphyxiations. Defendant also intimates that the Orgerons inexpediently utilized the water heater as an additional heating apparatus, but on this point there is no evidence whatsoever which would lead to a conclusion that the water heater was used for heating purposes. Mr. and Mrs. Orgeron freely admit that they opened all faucets in the premises and permitted a slight trickle of water or drip therefrom to keep up a constant flow of water in the pipes so that the water could not freeze. Whether Mrs. Charles authorized or advised them to do so is immaterial, as we do not think that it constituted negligence for the occupants of the house to permit a slight trickle or drip of water from the faucets. It is true that there was an outside cutoff to the water supply which could have been used in the circumstances, but the mere fact that the Orgerons chose to open the faucets slightly does not demonstrate negligence on their part, as such action seems to be a wellrecognized custom in this vicinity. Warren Bergeron, Plumbing Inspector for the City of Gretna, when asked "Is it also good precaution to open the faucets to some extent so as to keep the water flowing" replied: "Yes. I have been in the business quite a few years, and that's what I do in my own home." At another point in his testimony Bergeron further stated that as a plumber of experience and skill he believed it to be good practice in cold weather to open the faucets so the water can flow through them.
Whether the opening of the faucets to such an extent had the effect of causing the hot water to continually run is not shown by the record. The only expert testimony describing the operation of the water heater emanated from Frank J. Burlet, who was called as a witness by defendant. Burlet, an experienced plumber, stated that the water heater is equipped with a storage tank, and that when the water in the tank is heated to the temperature at which the thermostat is set, the flow of gas is automatically shut off. The gas cannot relight until a sufficient amount of hot water has been drawn out of the tank and cold water drawn into the tank in such volume as to reduce the temperature of the contents of the tank. It does not appear anywhere in the record as to how often the gas beneath the tank came into combustion *743 or whether the combustion was more than was normally required, but even if the gas burned more than was normally required for the supply of hot water, such fact could not militate against the plaintiffs for the reason that if the heater had been properly vented as required by the universal safety regulations, certainly no untoward incident would have ensued. Our opinion is that the turning on of the hot water faucets in the manner described did not constitute an independent cause of the occurrence, but that the lack of a vent on the heater was the sole and proximate cause of plaintiffs' injuries and damage.
The defendant-lessor is liable unto her tenant and members of his family and their guests. The liability to the tenant is provided for in LSA-C.C. arts. 2693 and 2695, which read as follows:
"Art. 2693. The lessor is bound to deliver the thing in good condition, and free from any repairs. He ought to make, during the continuance of the lease, all the repairs which may accidentally become necessary; except those which the tenant is bound to make, as hereafter directed."
"Art. 2695. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
The liability to Orgeron's wife and child and the guests of the Orgerons flows from LSA-C.C. arts. 670, 2315 and 2322, the pertinent parts of which read as follows:
"Art. 670. Every one is bound to keep his building in repair, so that neither their fall, nor that of any part of the materials composing them, may injure the neighbors or passengers, under the penalty of all losses and damages, which may result from the neglect of the owner in that respect."
"Art. 2315. Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; * * *"
"Art. 2322. The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
See Cheatham v. Bohrer, La.App., 17 So.2d 492, and the cases therein discussed.
In Davis v. Hochfelder, 153 La. 183, 95 So. 598, 599, the Court was concerned with a case wherein the wife of the tenant claimed damages against the lessor for injuries sustained in rescuing her son who had become asphyxiated in the bathroom of the leased premises wherein was located an unvented water heater. The evidence in the case, as stated by the Court, showed conclusively that the plaintiff's son was asphyxiated by monoxide gas or fumes from the combustion of gases burned by the water heater, and held the lessor liable in damages. The Court said:
"It is also unimportant that the defendant landlord knew nothing about the proper installation of hot water heaters. The testimony shows that plaintiff and the members of her family were as equally uninformed upon this subject. The heater being on the leased premises and included in the lease, plaintiff and her family had a right to presume that it was safe to use it in the condition in which it had been furnished for use by the landlord.
"That the wife of the lessee may recover damages against the lessor for personal injuries received by her through violation of the lessor's primary obligation to keep his building safe is well settled in our jurisprudence.
"In the case of Schoppel v. Daly, 112 La. 201, 36 So. 322, in interpreting article 2322 of the [LSA-] Civil Code, this court held that the wife had an action in her own legal right ex delicto under it, independently altogether of the lease contract.
*744 "Article 2322 reads as follows:
"`The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.'
"We said in the case of Ciaccio v. Carbajal, 142 La. 125, 76 So. 583:
"`We know of no provision of law making an exception to said articles 2315 and 2322 by which their scope should be limited so as not to include the members of a lessee's family or the guests or other persons on the leased premises by invitation of the lessee. As to a person other than the wife the scope of the article was so extended in Cristadoro v. Von Behren['s Heirs], 119 La. 1025, 44 So. 852, 17 L.R.A., N.S., 1161.'

* * * * * *
"Neither the lessee nor his wife nor his son were guilty of contributory negligence in using this heater without a vent or pipe."
The ill effects which Mrs. Schaubhut sustained as a result of her asphyxiation were not serious. She suffered pains in her head, experienced a buzzing sound in the ears, contracted a bad cough, and did not feel good for a week or so. For a few days her diet consisted only of liquids. We believe that an award of $200 will substantially compensate her and do substantial justice.
Therefore, for the reasons assigned the judgment appealed from is reversed, and it is now ordered that the plaintiff herein, Mrs. Lida Gaida, wife of Andrew Schaubhut, have judgment against the defendant, Mrs. Elaine Hourgettes, wife of D. M. Charles, for the full sum of $200, with legal interest from judicial demand, and for the costs of both courts.
Reversed.
REGAN, Judge (dissenting).
The proximate cause of the injuries incurred herein was the abuse, misuse or negligent operation of the "tank type" hot water heater by the tenants. The hot water faucets were permitted to run continuously which, of course, caused the thermostatically controlled hot water heater to burn uninterruptedly. Ordinary, average prudence would dictate shutting off the gas valve attached to the hot water heater before permitting the faucets connected therewith to run constantly in order to avoid the freezing of that water line due to the extreme cold weather.
The case of Davis v. Hochfelder, 153 La. 183, 95 So. 598, cited in the majority opinion in support of its views, is distinguishable in that the hot water heater involved therein was being used for the purpose for which it was intended and no negligence was shown to have attached to the injured person, while the hot water heater with which we are presently concerned was not being used in conformity with its purpose and the proximate cause of the injuries incurred was due to the negligence of the tenants in the operation thereof.