240 So.2d 545 (1970)
Charles W. JOYNER, Plaintiff-Appellee-Appellant,
v.
AETNA CASUALTY & SURETY COMPANY et al., Defendants-Appellants-Appellees.
No. 11457.
Court of Appeal of Louisiana, Second Circuit.
June 29, 1970.
On Rehearing October 13, 1970.
Writ Granted November 9, 1970.
*546 Johnston, Johnston & Thornton, by James J. Thornton, Jr., and J. Bennett Johnston, Jr., Shreveport, for plaintiff-appellee-appellant.
Cook, Clark, Egan, Yancey & King, by Sidney E. Cook, Shreveport, for Morehead Pools, Ltd., and Aetna Cas. & Sur. Co.
Bodenheimer, Jones, Klotz & Simmons, by G. M. Bodenheimer, Jr., Shreveport, for Wedgewood Park Const. Co., Inc.
Mayer & Smith, by Alex F. Smith, Jr., Shreveport, for Employers Mut. Liability Ins. Co. of Wisconsin and Swimquip, Inc.
Blanchard, Walker, O'Quin & Roberts, by Wilton H. Williams, Jr., Shreveport, for The Travelers Indemn. Co.
Lunn, Irion, Switzer, Johnston & Salley, by Richard H. Switzer, Shreveport, for Arthur W. Beck, Jr., and United States Fire Ins. Co.
Before AYRES, DIXON and PRICE, JJ.
AYRES, Judge.
This is an action in tort wherein plaintiff, Charles W. Joyner, seeks to recover damages for personal injuries accidentally sustained July 24, 1968, on the premises of Brighton Manor Apartments in Shreveport. Plaintiff sustained serious and permanent injuries when he attempted to dive from a diving board into a swimming pool constructed on the premises of and furnished for the use and pleasure of the tenants in the apartment complex.
Recovery by plaintiff, lessee of an apartment in the Brighton Manor Apartments, is sought against the landlord, Arthur W. Beck, Jr., and his insurer, United States Fire Insurance Company; Wedgewood Park Construction Company, general contractor constructing the apartments; Morehead Pools, Ltd., subcontractor in the construction of the pool, and its insurer, Aetna Casualty Surety Company; Swimquip, Inc., manufacturer of the diving board fulcrum, and its insurer, Employers Mutual Liability Insurance Company of Wisconsin; and The Travelers Indemnity Company, the insurer of Steve's Plating Corp., the alleged ultimate manufacturer of the diving board fulcrum.
Beck and his liability insurer are sought to be held liable to plaintiff under the provisions of the Revised Civil Code making the owner of premises responsible for the defects in those premises. LSA-C.C. Art. 2695. These defendants caused to be made third-party defendants Wedgewood Park Construction Company, Morehead Pools, and the latter's liability insurer, *547 and asserted, if there was any defect in the fulcrum which caused it to break, the liability of Beck was passive and only technical, and, therefore, in the event he was held liable, there should be judgment over and against these third-party defendants who allegedly caused the fulcrum to be installed. Thereupon, Wedgewood caused Morehead to be made a third-party defendant and, in consequence of that, Morehead caused Swimquip's liability insurer, Employers Mutual, to be made a third-party defendant, which, in turn, caused Travelers Indemnity, as insurer of Steve's Plating Corp., to be made a third-party defendant. Each third-party plaintiff sought judgment over and against its respective third-party defendant.
This cause was tried before a jury. The jury returned a verdict in favor of plaintiff and against Beck and his insurer, in solido, for the principal sum of $75,000.00, which the jury itemized as follows:

 Current medical expense $ 6,840.76
 Loss of wages 14,542.00
 Loss of future earnings 37,750.00
 Pain and suffering 15,867.24

Plaintiff's demands against all other defendants and their demands against each other in third-party proceedings were rejected. Judgment was rendered on a basis of the jury's verdict, and, from that judgment, defendants Beck and United States Fire Insurance Company suspensively appealed. Plaintiff and all other defendants, except Travelers, also appealed.
The defendant-appellant United States Fire Insurance Company, for and on behalf of itself and its assured, assigns as error: (1) the rendition of any judgment in plaintiff's favor against the defendant United States Fire Insurance Company; (2) the dismissal of its third-party petition against Wedgewood and against Morehead Pools and its insurer; (3) the finding that Beck was in any wise negligent proximately causing or contributing to the accident; (4) the refusal to enforce an indemnity agreement executed by Morehead Pools in favor of United States Fire Insurance Company; (5) the holding that the insureds of Employers Mutual, that is, Swimquip and Morehead Pools, were free from negligence in installing residential-type-and-size-pool equipment instead of commercial-size-and-strength equipment; (6) the award of excessive and extravagant amounts as damages; and (7) the permitting of a grossly excessive award by the jury to stand.
Plaintiff complains primarily that the award was inadequate and contends that it should be increased.
During June, 1968, plaintiff Charles W. Joyner, by written lease, became a tenant in the Brighton Manor Apartments. This complex, comprising 122 units, was relatively new. It was first opened for occupancy during the spring of 1968. Two swimming pools were provided for the use and pleasure of the tenants. One pool lacked diving equipment and thus, seemingly, by common consent, it was reserved for the general use of youngsters and family groups. The other pool, provided with a diving board, was normally used by adults only.
The diving board at the pool where plaintiff sustained accidental injuries rested on two metal stanchions which were set in the concrete surrounding the pool. The front support was called the "fulcrum"; the rear, the "anchor." Both were of tubular stainless steel, bent at each end to resemble three sides of a rectangle. The diving board was affixed to the anchor by screws. It rested on a rubber pad attached to the top of the fulcrum. The diving equipment had been in use for only a few months at the time of the accident.
On the afternoon of the accident, plaintiff and several companions repaired to the pool for a swim. Plaintiff went directly to the diving board. Though he had used the diving board on many prior occasions, this was to be his first dive of the day. Only he was using the board at the time. *548 After walking to the end of the board, plaintiff proceeded into what was described as a "hurdle." As his feet came down on the end of the board for the final time, prior to his intended spring from the board, plaintiff sensed that something was wrong; he felt something give way beneath him and heard the fulcrum crack. He lost his balance and, as he fell into the pool, he sustained, in striking the board, a blow of considerable force to the lower portion of his back. From the water, he saw the broken fulcrum and realized what had happened. The fulcrum was broken in two near its top center.
Report of the accident was immediately given to defendant Beck or to his office in Dallas, Texas. Repairs were made without delay by local workmen. The broken fulcrum was removed and replaced by a new one. Examination of the old fulcrum to determine the exact cause of its failure could not be made. The pieces of this equipment had been removed from the premises by the workmen and transported to the city dump where they could not subsequently be located. The record indicates it would have required metallurgical tests to determine the cause of the failure in the fulcrum.
The record does not support a conclusion that the diving board was improperly installed, that it was composed of defective material, that it was improperly manufactured, that it was of a type not designed for the use which could reasonably be expected of it, or that Beck was furnished a type or design different in strength from what he desired or actually purchased. The testimony, moreover, establishes that, on occasions, the equipment had been subjected to abuse. As many as two, three, and four adults were shown to have been on the diving board at a time. While this is not shown beyond a possibility as a cause of the failure of the fulcrum, nevertheless, in the absence of substantial proof to the contrary, these facts constitute a factor to be considered in determining whether or not the proof is sufficient to conclude the manufacturer or installer of this equipment may have been at fault.
From the record, it could not be said that the defendant landlord makes a serious defense except to attempt to recover from the building contractor. Nor may it be concluded that liability of the contractor constructing the apartment complex was established.
LSA-C.C. Art. 2695 provides:
"The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
Based on the language of this codal provision, the principle appears to be well established in the jurisprudence that a lessee who, without fault, sustains an injury caused by a defect in the leased premises is entitled to recover damages from his lessor.
Bates v. Blitz, 205 La. 536, 17 So.2d 816 (1944);
Sabin v. C & L Development Corporation, 141 So.2d 482 (La.App., 1st Cir.1962);
Green v. Southern Furniture Company, 94 So.2d 508 (La.App., 1st Cir.1957);
Gaida v. Hourgettes, 67 So.2d 737 (La.App., Orl.1953);
Estes v. Aetna Casualty & Surety Co., 157 So. 395 (La.App., Orl.1934).
Nevertheless, and as heretofore pointed out, defendants Beck and his insurer take the position that, if they are responsible to plaintiff in this case, their *549 liability is simply technical or vicarious; that Beck, having entered into a contract with Wedgewood Park to build the complex and install the proper materials, is entitled to a judgment over and against Wedgewood Park for any amount for which he might be cast. We find in the record no basis for this claim inasmuch as the proof is insufficient to establish that the materials used in the construction of the apartment complex were improper, defective, insufficient, or that the installation was improperly done.
Nor do we find any merit in the charge of negligence predicated upon a change of materials in the fulcrum from brass to stainless steel; nor from the specification of the thickness of the material from .049" to .065" following the installation of the swimming pool at the apartments. The proof does not establish that the materials originally used in the construction were defective on this account. Materials of the same type had been successfully used without mishap for a prolonged period of time. Moreover, a change in materials and an improvement in construction are not an admission that materials formerly used were defective or that prior methods of construction were faulty.
However, Beck and his insurer take the further position that, under the terms of a contract between Wedgewood Park and Morehead Pools, the latter, having supplied and installed the fulcrum, is liable to Beck and his insurer if the installation was improperly done or defective materials were furnished. The provision of the contract referred to provides:
"* * * Subcontractor agrees to be responsible for and to indemnify and hold Contractor and Owner harmless from any loss, injury, damage or expense either to persons (whether employees or members of the public) or to any property to whomsoever belonging arising out of or resulting from the performance by Subcontractor or occasioned by the act or neglect of Subcontractor or his agents, servants or employees." (Emphasis supplied.)
The answer to this contention is, again, as heretofore pointed out, there is no showing by a reasonable preponderance of evidence that the fulcrum was not correctly installed or was of defective or improper materials.
Defendants Beck and his insurer make the further contention that it is not every defect in premises which makes the owner of the premises liable to a tenant or third party; that such a defect must be substantial and of such nature as to likely cause injury to a reasonably prudent individual; and that the burden of proof rests upon plaintiff to show that the diving board and its supports were in fact defective and that such defect caused injury. They also contend that the mere fact that an accident occurs to a tenant on leased premises does not, in itself, establish negligence on the part of the landlord and does not constitute a prima facie showing that the premises are dangerous or defective. Cited in support of these contentions are these cases:
Brown & Blackwood v. Ricou-Brewster
Building Co.,
 239 La. 1037, 121 So.2d 70 (1960);
Morgan v. American Indemnity Company,
 180 So.2d 429 (La.App., 1st Cir.1965);
Bougon v. Traders & General Insurance
Company,
 146 So.2d 535 (La.App., 4th Cir.1962);
Davilla v. Richardson,
 120 So.2d 293 (La.App., Orl. 1960cert.
 denied).
We are generally in accord with the contention that the mere fact that an accident is sustained by a tenant is not in itself proof of negligence on the part of the landlord. The proof, however, is clear that the diving board and its supports were, in fact, at the time of the *550 accident, defective and that such defects caused the injury. The record leaves no room for serious doubt of these facts the top section of the fulcrum connecting the stanchions gave way and broke, thwarting plaintiff's final spring on the board and causing him to fall with his back striking the board itself.
The cases cited by defendants-appellants are, in our opinion, inapplicable to the facts of the instant case. In the Morgan case, Mrs. Morgan failed to establish by a preponderance of evidence that the accident in which she was injured occurred because of a defective condition of the residence occupied by her and her husband as lessees. The situation was the same in Brown & Blackwood. There lessees' action was against the landlord for damages alleged to have resulted from a fire occurring on the premises and allegedly occasioned by vices and defects in those premises. It was held that the lessees failed to carry the burden of proof by a preponderance of evidence and establish that the fire had its origin in some vice or defect of the premises. The same lack of proof was prevalent in the Davilla case. There was a failure to establish the fire in the tenant's apartment and the damages resulting therefrom were caused by a defect in the leased premises. In the Bougon case, likewise an action for damages predicated on an alleged defective diving board, under charges directed specifically to the looseness of a nut on one side of the rear of the board, the evidence failed to reveal causal connection between that fact and an injury sustained by plaintiff consisting of a tear or rupture of the quadriceps tendon in his leg sustained when jumping from the board.
As heretofore noted, plaintiff's accidental injuries resulted directly from the failure of the fulcrum as plaintiff attempted to spring from the diving board, and these injuries were attributable directly to the fulcrum's defective condition.
Legal principles controlling matters of this kind are well established. An owner-lessor is liable for injuries suffered by a tenant which are caused by a defective condition of the premises. The appropriate codal provision, quoted hereinabove, makes it very clear that a lessor guarantees a lessee against all the vices and defects of the thing which may prevent its being used in the manner contemplated, notwithstanding he knew nothing of the existence of such vices and defects, and that, if any loss results to the lessee from such vices and defects, the lessor shall be bound to indemnify him for such losses or damages.
Anslem v. Travelers Insurance Company,
 192 So.2d 599 (La.App., 3d Cir.1966);
Morgan v. American Indemnity Company,
 supra.
In order to enforce this liability, an injured lessee need only establish by a preponderance of evidence that the injuries were proximately caused by the defective condition.
King v. Allstate Insurance Company,
 224 So.2d 42 (La.App., 1st Cir. 1969);
Schmidt v. Indemnity Insurance Co. of
 North America,
 143 So.2d 289 (La.App., 4th Cir.1962);
Davilla v. Richardson,
 supra.
Thus, plaintiff's right to recover from his lessor and the lessor's insurer does not depend solely upon fault or negligence. His right arises out of the obligations of a lessor to his lessee as prescribed by LSA-C.C. Art. 2695, quoted hereinabove. This article provides for liability without fault as the word is generally understood. A lessee needs only to show injury from an accident caused by a defect on the premises. Contributory negligence and an act of God are seemingly the only defenses available to a lessor. Neither defense was presented or established here.
*551 In interpreting the language of LSA-C. C. Art. 2695, the courts have consistently treated this article "in pari materiae" with LSA-C.C. Arts. 670 and 2322.
Gaida v. Hourgettes,
 supra.
These articles provide:
"Art. 670. Every one is bound to keep his buildings in repair, so that neither their fall, nor that of any part of the materials composing them, may injure the neighbors or passengers, under the penalty of all losses and damages, which may result from the neglect of the owner in that respect."
"Art. 2322. The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
The responsibility of a lessor to his tenant under the provisions of these codal articles was concisely stated in Phillips v. Cohen, 183 So.2d 473, 475 (La.App., 4th Cir.1966):
"Under Louisiana law, particularly LSA-C.C. Arts. 670 and 2322, the owner-lessor is held to strict liability, i. e., liability without fault on his part, for personal injuries sustained as a result of the defective condition of the leased premises and he cannot successfully defend on the basis of ignorance of the condition of the building or of the fact that the defect could not be detected; knowledge of even latent defects for which he is responsible is imputed to the owner-lessor and he is presumed to know of them."
See, also:
Bates v. Blitz,
 supra;
Sabin v. C & L Development Corporation,
 supra;
Poss v. Brown,
 73 So.2d 661 (La.App., 2d Cir.1954);
Thompson v. Suprena,
 65 So.2d 801 (La.App., Orl.1953);
Estes v. Aetna Casualty & Surety Co.,
 supra.
Moreover, a lessor's obligations extend beyond buildings and encompass all features of the premises available to a lessee. For instance, as stated in Sabin v. C & L Development Corporation, supra:
"Under the provisions of LSA-C.C. Article 2695, the lessor is liable in damages to his tenant for injuries to the latter resulting from vices or defects in the leased premises. The liability provided for in the above numbered article extends not only to vices or defects in the apartment occupied by the lessee but also to the accessories thereto including the entrance, courtyard, stairways and approaches used in common with other tenants. Estes v. Aetna Casualty & Surety Co., La.App., 157 So. 395; Bates v. Blitz, 205 La. 536, 17 So.2d 816."
141 So.2d 485.
The Sabin case concerned a drainage ditch adjacent to a series of carports in a large apartment complex. The Estes case involved an outside passage, and Bates v. Blitz arose out of a defective platform on the premises. In Gaida v. Hourgettes, supra, recovery was permitted for a defective heater that caused asphyxiation. A tenant who leaned against and fell through a defective balustrade was permitted to recover damages in Johnson v. Crescent Arms Apartments, Inc., 221 So.2d 633 (La.App., 4th Cir. 1969writ refused). In Robinson v. Fossett, La.App., 33 So.2d 546, stairs which broke under plaintiff's 250-pound weight resulted in recovery against the landlord.
The right of recovery has been recognized in accidents resulting from falling ceiling plaster (Boyd v. Dorvin, La.App., *552 177 So. 76; Jackson v. Lo Greco, La.App., 181 So. 561; and Ayo v. Holzenthal, 19 La. App. 561, 141 So. 92); defective floors (Walsh v. Whitney Nat'l Bank, La.App., 4 So.2d 553; Burnette v. Toebelman, La.App., 196 So. 529; King v. Bankers Indemnity Ins. Co., La.App., 180 So. 176; Landry v. Monteleone, 150 La. 546, 90 So. 919); defective railings (Gray v. Succ. of Spiro, La.App., 14 So.2d 92; Bartholomew v. Impastato, La.App., 12 So.2d 700; Mosher v. Burglass, La.App., 170 So. 416; Willis v. Cahn, La. App., 164 So. 452); and defective stairways (Green v. Frederick, La.App., 141 So. 505; Thompson v. Donald, La.App., 169 So. 242; Matranga v. Hilman, 94 So.2d 568 (La. App., 2d Cir. 1957).
We therefore conclude there was no error in the trial judge's approval of the jury's finding of liability on the part of defendants Beck and his insurer.
Lastly for consideration is the question of quantum. Usual contentions that the award is inadequate or excessive are prevalent in this case.
Plaintiff, of the athletic type, 34 years of age, with 2½ years of college work toward a degree, suffered severe and intense pain and sustained permanent disability of 25-30% to his body as a whole as a result of the accident.
Plaintiff was first seen by Dr. James W. Tucker, a general practitioner, his regular physician, who committed him to a hospital. Plaintiff was thereafter referred to The Bone and Joint Clinic, headed by Dr. Donald F. Overdyke, Jr., an orthopedic surgeon. He was first seen in the clinic by Dr. Don K. Joffrion, but soon thereafter came under the care and attention of Dr. Overdyke as his treating physician. Examination at the clinic disclosed facts from which Dr. Overdyke suspected a herniated disc between the L-4 and L-5 levels. This diagnosis was confirmed by an electromyograph administered by Dr. Krusen of Dallas, Texas, and through surgery thereafter performed by Dr. Overdyke under date of September 30, 1968. This surgery also revealed a condition related to the accident and referred to as a coccydynia. This condition produced an abnormal degree of mobility in the coccyx, causing pain. Also disclosed was an overtight, scarred nerve root which produced pain on movement of the spine. These conditions were thought, after the first operation, to have yielded to surgical repair.
Plaintiff was discharged from the hospital October 10, 1968, after which he continued as an outpatient of the clinic. He returned periodically for examination and treatment by Dr. Overdyke. He was apparently making progress in recovery until January, 1969, when he again complained of pain, stiffness, and inability to sit for an appreciable period of time. His condition was found, in May, 1969, to be deteriorating. Found was definite instability at the lumbosacral joint. Complaints of pain increased. A second electromyograph, in June, 1969, disclosed conditions justifying plaintiff's continued complaints. Nerveroot irritation was again disclosed at the L-4 and L-5 levels. A second operation became necessary to fuse the joints from L-4 to the sacrum. For this purpose, bone was taken from an incision made in plaintiff's hip. This surgical procedure was performed July 28, 1969. To afford better stability, metal screws were inserted in the spine.
Four periods of hospitalization extended over a period of 80 days. Dr. Overdyke expressed the opinion, after four months following the last surgery and 16 months after the accident, there was a possibility, but not a probability, of the necessity of plaintiff's undergoing further surgery. The doctor's opinion was that after maximum recovery plaintiff would sustain a permanent disability of 25-30% of his body as a whole.
Despite plaintiff's sporadic employment in gainful occupations, his income tax return for 1967 disclosed an income of $5,841.25, and the return for 1968 disclosed *553 earnings in that year prior to July 24 of $2,657.25. Some of his earnings were golf prizes, fees received from services as a life guard at swimming pools, and remuneration for teaching swimming lessons. During a comparable period of time (one and a half years) intervening between the accident and the trial, it would appear reasonable to conclude that plaintiff's earnings would have been approximately the same in the absence of any substantial proof leading to the contrary.
An award for the loss of future earnings presents a more difficult problem. Proof as to plaintiff's prospective future earnings is subject to considerable speculation and conjecture. Although able to perform many kinds of work not requiring much physical exertion and effort, judging from the past, plaintiff's propensities or inclination were not conducive to regular employment requiring physical labor. His ability to engage in sedentary occupations or activities is not shown to have been seriously impaired. According to Dr. Overdyke, plaintiff may continue to play golf and he may swim. He was, however, advised to discontinue diving.
That plaintiff suffered intense pain over prolonged and extended periods of time because of the injuries inflicted and as occasioned through surgery twice performed, there can be no doubt.
However, it appears appropriate that we point out here that neither the jury in its verdict nor the court in its judgment made an award for plaintiff's permanent disability. The estimate of disability of the body as a whole at 25-30% is not insignificant considering the length of time plaintiff, in the ordinary course of life, may be compelled to endure pain and discomfort because of the accident. Taking into consideration hospital and medical expenses incurred, as well as plaintiff's loss of earnings mentioned above, the pain and suffering endured, and the permanent disability sustained, an award of $50,000.00 appears sufficient to adequately compensate plaintiff, and the award in excess thereof was an abuse of the "much discretion" vested in the jury and the trial court.
For the reasons assigned, the judgment appealed is amended by reducing the award to $50,000.00 and, as amended, it is affirmed.
Amended and affirmed.

ON REHEARING
Before AYRES, BOLIN, DIXON, PRICE and WILLIAMS, JJ.
PRICE, Judge.
In our original opinion in this action we affirmed the finding of the trial jury holding the owner-lessor, Arthur W. Beck, Jr., and his liability insurer, United States Fire Insurance Company, liable for the injuries sustained by plaintiff resulting from a fall on a diving board caused by a collapse of the fulcrum. The jury rejected the demands in all third party actions seeking to inculpate the general contractor, Wedgewood Park Construction Company; the swimming pool sub-contractor, Morehead Pools, Ltd.; Swimquip, Inc., supplier of the equipment; and Steve's Plating Corporation, manufacturer of the fulcrum.
We amended the judgment appealed from to reduce the jury award of $75,000. to $50,000. An application for rehearing was made by Andrew W. Beck, Jr., and United States Fire Insurance Company, objecting to the action of this court in rejecting their third party demands against Wedgewood Park Construction Company, Morehead Pools, Ltd., and Aetna Casualty & Surety Company, Morehead's insurer.
Plaintiff also applied for a rehearing, asserting that this court erred in modifying the amount awarded by the trial jury by finding manifest error. Both applications were granted by this court and the case re-argued before the court sitting en banc.
In their application for rehearing, defendant, Beck and his insurer specify our *554 errors in rejecting their third party demands against Wedgewood Park, Morehead and Aetna, as follows:
1. That the indemnity clause contained in the construction contract between Wedgewood Park and Morehead was misconstrued by this court.
2. That we erred in not finding negligence on the part of Morehead in installing a fulcrum designed for residential rather than commercial use at an apartment complex the size of Brighton Manor.
3. That we further erred in holding that Beck received the type equipment ordered by him when he had relied solely on the general contractor, Wedgewood Park, to select and install appropriate equipment for this project.
4. It is further contended that this court made contradictory rulings in holding that the fulcrum was defective in establishing liability against Beck and his insurer, but finding no defect therein in rejecting the third party demand against the remaining defendants.
After further study and evaluation of the evidence we are constrained to adhere to our original views on the question of liability of the defendants cast and the rejection of all third party demands.
As pointed out in our original opinion, the landlord's liability under LSA-C.C. art. 2695, arises when the lessee, who is without fault, sustains an injury caused by a defect in the leased premises, whether the lessor knew of the defect or not. We found the evidence sufficient to establish that the injury was caused by a defect in the diving board equipment (fulcrum). However, we did not find that the evidence established what or who caused the defective condition.
The liability of the various third party defendants is contingent on proof being adduced sufficient to establish by a preponderance of the evidence that their negligence caused the defect and resulting injury. Mere supposition or conjecture is not sufficient.
As stated in our original opinion, the evidence no more proves the cause of the collapse of the fulcrum to have been the selection and use of a residential type rather than a commercial one than that the cause was an abuse of the equipment permitted by lessor involving as many as four heavy adults jumping on the board at one and the same time on several occasions. The equipment had been under the exclusive control and use of lessor for a period of more than two months prior to this accident.
This same lack of evidence precludes any need to resolve the extent of the indemnity intended under the construction contract between Wedgewood and Morehead, as the evidence is not sufficient to show that the accident and resulting liability to lessor arose from the performance of, or resulted from this sub-contract.
In plaintiff's application for rehearing seeking a restoration of the full amount awarded herein by the jury in the lower court, he suggests that we failed to give recognition to the pronouncements of the Supreme Court in the case of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), and Ballard v. National Indemnity Company of Omaha, Nebraska, 246 La. 963, 169 So.2d 64 (1964).
The injury suffered by plaintiff, its severity, and all consequences resulting therefrom, are fully and adequately set forth in our original opinion and will not be repeated herein. The only error made in stating the facts relating to plaintiff's past earnings in our former opinion was the inadvertent use of the total shown on a W-2 form reflecting total income for the year 1968 of $2,657.25, whereas the tax return *555 for 1968 showed an income of $4,632.35.
However, this error is now merely pointed out to set the record straight and is not a controlling factor in the result now reached by us on the question of quantum.
The trial jury, in awarding plaintiff $75,000. itemized their verdict as follows:

 Medical expenses $ 6,840.76
 Loss of wages 14,542.00
 Loss of future earnings 37,750.00
 Pain and suffering 15,867.24

The items for medical expenses and loss of wages, totaling $21,382.76, is subject to exact mathematical calculation. Therefore, our reduction of the award in effect gave the sum of $28,617.24, for the intangible damages suffered by him, such as pain, suffering, and loss of future earnings.
It is plaintiff's position that there is ample evidence in the record to sustain the amount awarded by the jury, and that by a comparison of awards made in similar cases, the jury award is not excessive nor does it abuse the discretion vested in the trial court in the award of damages.
In addition to the Supreme Court cases previously cited herein, plaintiff cited prior expressions of this court as to our duty in reviewing awards of trial courts.
In Guy v. Kroger Company, 204 So.2d 790 (La.App.2d Cir., 1967), we declared our understanding of the Ballard case as follows:
"* * * The appellate court should review all the facts and circumstances upon which the lower court based the amount of the award but this review is confined to determining whether there has been abuse of the `much discretion' and awards in `similar' cases are relevant only to determine whether there has been an abuse of discretion but for no other purpose. In other words, there should not be an attempt to maintain a uniformity of awards for what the appellate court interprets to be similar cases. The reason for such a rule is the inability of any appellate court to judicially determine similarity of cases involving personal injuries. Each case is different and the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to the case under review. Ballard v. National Indemnity Company of Omaha, Nebraska, 246 La. 963, 169 So.2d 64 (1964).
"* * * We conclude that to either increase or decrease the award would be to substitute our judgment for that of the jury when the record is sufficient to support its findings."
Also, in the case of Welch v. Ratts, 235 So.2d 422 (La.App.2d Cir., 1970), we stated our function in this language:
"* * * As we have stated on previous occasions, we do not believe it is our function under the controlling jurisprudence to attempt to standardize awards in personal injury cases. Neither are we to substitute our opinion for that of the trial judge unless his findings in this regard demonstrate that he has abused the discretion vested in him under the appropriate articles of our Civil Code."
In this case the plaintiff, thirty-four years old, sustained a permanent disability of 25 to 30 percent of his body as a whole. Hospitalization prior to trial amounted to 80 days with the possibility of another operation being required in the future. Medical treatment has thus far extended over a period of approximately two years. By reference to the itemized verdict of the jury, their award for the intangible damages of pain, suffering and loss of future *556 earnings is the sum of $53,617.24. This court was of the original opinion the sum of $28,617.24 was adequate for this purpose.
There is no inference that the trial jury was persuaded by prejudice or sympathy in arriving at their verdict. To the contrary, it appears that they gave serious consideration to the various factors which are to be considered in assessing damages. In reducing this portion of the award on the basis of the evidence in the record, the action of this court would be tantamount to substituting our judgment for that of the jury where there is sufficient evidence to support its finding. We do not believe that to be our proper function and now find that we committed error in our original opinion wherein we modified the judgment of the jury.
For the foregoing reasons the judgment appealed from is affirmed at appellant's cost.
DIXON, J., dissents, giving written reasons.
DIXON, Judge (dissenting).
I respectfully dissent.
We have changed the original opinion of this Court for the stated reason that it is not "our proper function" to substitute our judgment for that of the jury "where there is sufficient evidence to support its finding."
This is not my understanding of the role of appellate courts in Louisiana. It is the rule in criminal cases, and is the rule in common law states. It should not be the law in Louisiana.
In my opinion, the verdict of the jury was excessive, and should be reduced.